# United States Court of Appeals

*for the*

# First Circuit

Case No. 24-1389

UNITED STATES,

*Appellee,*

v.

DANIEL E. CARPENTER,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, BOSTON, IN CASE NO. 1:04-CR-10029-GAO-1
HONORABLE GEORGE A. O'TOOLE, U.S. DISTRICT JUDGE

## BRIEF FOR DEFENDANT-APPELLANT IN
## SUPPORT OF WRIT OF CORAM NOBIS

DANIEL E. CARPENTER
*Defendant-Appellant Pro se*
18 Pond Side Lane
West Simsbury, Connecticut 06092
(860) 573-7770

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... ii

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ..........................................................3

ARGUMENT ...........................................................................................4

    I.    THE COURT IS OBLIGATED TO VACATE A
           CONVICTION WHEN A PETITIONER IS ACTUALLY
           INNOCENT AND HAS SPENT SEVERAL YEARS IN
           CUSTODY FOR AN OFFENSE HE DID NOT COMMIT ................4

    II.   THE SUPREME COURT'S UNANIMOUS DECISION IN
           *XIULU RUAN* IS ALSO DISPOSITIVE IN THIS CASE ...................9

    III.  SOMETHING MORE ENERVATING THAN HELL .......................10

    IV.  THE DISTRICT COURT LACKED SUBJECT MATTER
           JURISDICTION ...................................................................21

    V.   PETITIONER'S CONVICTION MUST BE SET ASIDE
           BASED ON *ABDELAZIZ* ....................................................30

    VI.  VENUE WAS IMPROPER IN THE DISTRICT OF
           MASSACHUSETTS ............................................................40

    VII. THE INDICTMENT WAS UNTIMELY AND DID NOT
           PROVIDE CONSTITUTIONAL FAIR WARNING ........................47

    VIII. THE DUE PROCESS VIOLATIONS IN THIS CASE ARE
           EXTRAORDINARY ...........................................................53

CONCLUSION ......................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Arbaugh v. Y & H Corp.*,
  546 U.S. 500 (2006)..........................................................22

*Arthur Andersen v. United States*,
  544 U.S. 696 (2005)..........................................................52

*Banks v. Dretke*,
  540 U.S. 668 (2004)..........................................................55

*Barker v. Wingo*,
  407 U.S. 514 (1972)................................................. *passim*

*Berger v. United States*,
  295 U.S. 78 (1935)............................................................58

*Betterman v. Montana*,
  136 S.Ct. 1609 (2016)............................................. *passim*

*Bloate v. United States*,
  559 U.S. 196 (2010)............................................ 18, 61, 62

*Boumediene v. Bush*,
  553 U.S. 723 (2008)............................................................5

*Murray v. Carrier*,
  477 U.S. 478 (1986)........................................................4, 5

*Ciminelli v. United States*,
  143 S.Ct. 1121 (2023)....................................................5, 7

*Cleveland v. United States*,
  531 U.S. 12 (2000)........................................... 22, 23, 29

*Coggins v. O'Brien*,
  188 F.2d 130 (1st Cir. 1951) ......................................55

*Coleman v. Thompson*,
  501 U.S. 722 (1991)............................................................5

*Cone v. Bell*,
  556 U.S. 449 (2009)................................................ 58, 59

*Dixon v. White*,
210 Fed. Appx. 498 (6th Cir. 2007) ............................................................. 21, 64

*Doggett v. United States*,
505 U.S. 647 (1992) .................................................................................... *passim*

*Drumgold v. Callahan*,
707 F.3d 28 (1st Cir. 2013) ........................................................................ 54, 55

*Durland v. United States*,
161 U.S. 306 (1896) .................................................................................... 34, 35

*Elonis v. United States*,
575 U.S. 723 (2015) .............................................................................. 9, 51, 52

*Ex Parte Merryman*,
17 F. Cas. 144 (1861) .....................................................................................7, 9

*Gabelli v. S.E.C.*,
568 U.S. 442 (2014) .................................................................................... 47, 48

*Giglio v. United States*,
405 U.S. 150 (1972) .................................................................................... *passim*

*Kann v. United States*,
323 U.S. 88 (1944) ...................................................................................... 36, 37

*Keeney v. Tamayo–Reyes*,
504 U.S. 1 (1992) ...............................................................................................4

*Klopfer v. North Carolina*,
386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967) ..............................................15

*Kokesh v. S.E.C.*,
137 S.Ct. 1635 (2017) .................................................................................. 2, 47

*Kuhlmann v. Wilson*,
477 U.S. 436 (1986) ...........................................................................................4

*Kyles v. Whitley*,
514 U.S. 419 (1995) ........................................................................................58

*Limone v. Condon*,
372 F.3d 39 (1st Cir. 2004) ........................................................................ 54, 55

*Marinello v. United States*,
138 S.Ct. 1101 (2018) ............................................................ 48, 49, 50, 52

*McBoyle v. United States*,
283 U.S. 25 (1931) ................................................................... 8, 49, 52

*McCleskey v. Zant*,
499 U.S. 467 (1991) .........................................................................4

*McDonnell v. United States*,
136 S.Ct. 2355 (2016) ....................................................................36

*McEvoy Travel v. Heritage Travel*,
904 F.2d 786 (1st Cir. 1990) ....................................................... 31, 35

*McQuiggin v. Perkins*,
569 U.S. 383, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013) .................6, 7

*Miller v. Pate*,
386 U.S. 1 (1967) ..................................................................... 55, 56

*Molina-Martinez v. United States*,
136 S.Ct. 1338 (2016) ............................................................... 22, 24

*Mooney v. Holohan*,
55 S.Ct. 340 (1935) .......................................................................55

*Moore v. Arizona*,
414 U.S. 25 (1973) ................................................................ *passim*

*Morissette v. United States*,
342 U.S. 246 (1952) .............................................................. 8, 9, 50, 51

*Murray v. Carrier*,
477 U.S. 478 (1986) .........................................................................4

*Napue v. Illinois*,
360 U.S. 264 (1959) ............................................................ 53, 54, 55, 56

*Neder v. United States*,
527 U.S. 1 (1999) ..................................................................... 32, 39

*Ouimette v. Moran*,
942 F.2d 1 (1st Cir. 1991) ....................................................... 3, 56, 59

*Rehaif v. United States*,
588 U. S. ——, 139 S.Ct. 2191 (2019)............................... 9, 10, 21, 23

*Rosales-Mireles v. United States*,
138 S.Ct. 1897 (2018) ........................................................ 22, 24, 29, 45

iv

*Ruan v. United States*,
  No. 20-1410, 2022 WL 2295024 (U.S. June 27, 2022) ................................. 9, 10

*Sanchez v. Triple-S*,
  492 F.3d 1 (1st Cir. 2007) ............................................................ 31, 39

*Sibron v. New York*,
  392 U.S. 40 (1968) ...........................................................................6

*Skilling v. United States*,
  561 U.S. 358 (2010) ................................................................ *passim*

*Smith v. Cain*,
  132 S.Ct. 627 (2012) .......................................................................56

*Smith v. United States*,
  143 S.Ct. 1594 (2023) ................................................................ 46, 47

*Strickler v. Green*,
  527 U.S. 263 (1999) .................................................................... 55, 58

*Travis v. United States*,
  364 U.S. 631 (1961) .........................................................................43

*Turner v. United States*,
  137 S.Ct. 1885 (2017) ................................................................ 58, 59

*United States v. Abdelaziz*,
  68 F.4th 1 (1st Cir. 2023) ........................................................ *passim*

*United States v. Agurs*,
  427 U.S. 97 (1976) ..........................................................................58

*United States v. Anderson*,
  328 U.S. 699 (1946) .................................................................... 41, 42

*United States v. Auernheimer*,
  748 F.3d 525 (3d Cir. 2014) ...................................................... 43, 44, 45

*United States v. Autuori*,
  212 F.3d 105 (2d Cir. 2000) ...............................................................31

*United States v. Bagley*,
  473 U.S. 667 (1985) ........................................................................58

*United States v. Balint*,
  258 U.S. 250 (1922) ........................................................................52

*United States v. Berroa,*
    856 F.3d 141 (1st Cir. 2017) ................................................... 22, 24, 39

*United States v. Bravo-Fernandez,*
    913 F.3d 244 (1st Cir. 2019) ................................................... *passim*

*United States v. Cabrales,*
    524 U.S. 1 (1998).................................................................. 42, 43, 44

*United States v. Carpenter,*
    405 F.Supp.2d 85 (D.Mass. 2005) ...................................................41

*United States v. Carpenter,*
    736 F.3d 619 (1st Cir. 2013) ...........................................................53

*United States v. Carpenter,*
    781 F. 3d 599 (1st Cir. 2015) ................................................... *passim*

*United States v. Carpenter,*
    808 F.Supp.2d 366 (D.Mass. 2011) .................................................54

*United States v. Cores,*
    356 U.S. 405 (1958)........................................................................43

*United States v. Countrywide,*
    822 F.3d 650 (2d Cir. 2016)..................................................... *passim*

*United States v. Dezeler,*
    81 F.3d 86 (8th Cir. 1996) ....................................................... 18, 62

*United States v. El Naddaf,*
    No. CR 13-10289-2-DPW, 2023 WL 2541555
    (D. Mass. Mar. 16, 2023) ....................................................... *passim*

*United States v. Erenas-Luna,*
    560 F.3d 772 (8th Cir. 2009).................................................... 21, 64

*United States v. Ferreira,*
    665 F.2d 701 (6th Cir. 2011) ................................................... 21, 64

*United States v. Finazzo,*
    850 F.3d 94 (2d Cir. 2017) ..............................................................32

*United States v. Gonzalez-Gonzalez,*
    258 F.3d 16 (1st Cir. 2001) .............................................................55

*United States v. Guzman-Merced*,
  2020 WL 7585176 (1st Cir. 2020) .................................................... 21, 23, 49, 50

*United States v. Handa*,
  892 F.3d 95 (1st Cir. 2018)............................................................ *passim*

*United States v. Huete-Sandoval*,
  668 F.3d 1 (1st Cir. 2011) ........................................................... 18, 62

*United States v. Ingram*,
  446 F.3d 1332 (11th Cir. 2006) .................................................... 21, 64

*United States v. Irizarry-Colón*,
  848 F.3d 61 (1st Cir. 2017) .......................................................... *passim*

*United States v. Jefferson*,
  674 F.3d 332 (4th Cir. 2012) ...........................................................43

*United States v. Johnson*,
  323 U.S. 273 (1944).................................................................. 40, 41

*United States v. Lanoue*,
  137 F.3d 656 (1st Cir. 1998) ............................................................40

*United States v. Lara*,
  970 F.3d 68 (1st Cir. 2020) ..............................................................21

*United States v. Lesane*,
  No. 20-7144, 2022 WL 2720852 (4th Cir. July 14, 2022)........................... 6, 7, 8

*United States v. Loud Hawk*,
  474 U.S. 302 (1986)......................................................... 16, 20, 60, 63

*United States v. Lovasco*,
  431 U.S.  (1977)...................................................................... 17, 60

*United States v. Manatau*,
  647 F.3d 1048 (10th Cir. 2011) .........................................................51

*United States v. Marion*,
  404 U.S. 307 (1971)................................................................. *passim*

*United States v. Maze*,
  414 U.S. 395 (1974)................................................................. 36, 37

*United States v. Mittelstaedt*,
  31 F.3d 1208 (2d Cir. 1994) ............................................................32

*United States v. Morgan,*
  346 U.S. 502 (1954)......................................................................27

*United States v. Passodelis,*
  615 F.2d 975 (3d Cir. 1980)........................................................43

*United States v. Peter,*
  310 F.3d 709 (11th Cir. 2002) ............................................ *passim*

*United States v. Rodriguez-Moreno,*
  526 U.S. 275 (1999).....................................................................42

*United States v. Rosa-Ortiz,*
  348 F.3d 33 (1st Cir. 2003) ................................................. *passim*

*United States v. Russell,*
  369 U.S. 749 (1962).....................................................................26

*United States v. Saade,*
  652 F.2d 1126 (1st Cir. 1981) ....................................................27

*United States v. Salinas,*
  373 F.3d 161 (1st Cir. 2004) ............................................... *passim*

*United States v. Scott,*
  270 F.3d 30 (1st Cir. 2001) ........................................................41

*United States v. Seward,*
  967 F.3d 57 (1st Cir. 2020) ........................................................42

*United States v. Strain,*
  396 F.3d 689 (5th Cir. 2005).......................................................44

*United States v. Takhalov,*
  827 F.3d 1307 (11th Cir. 2016) ............................................ 32, 38

*United States v. Tavares,*
  844 F.3d 46 (1st Cir. 2016) ................................................. *passim*

*United States v. Tinklenberg,*
  131 S.Ct. 2007 (2011) ........................................................... 18, 62

*United States v. United States Gypsum,*
  438 U.S. 422 (1978)............................................................... 51, 52

*United States v. Uribe,*
  890 F.2d 554 (1st Cir. 1989) ................................................ 40, 41

*United States v. Valdes-Ayaya,*
  900 F.3d 20 (1st Cir. 2018) ...................................................29

*United States v. Velazquez,*
  749 F.3d 161 (3d Cir. 2014).......................... 14, 15, 19, 62

*United States v. Walters,*
  997 F.2d 1219 (CA7 1993) ........................................ 25, 37

*United States v. Weimert,*
  819 F.3d 351 (7th Cir. 2016) ................................... 32, 37

*United States v. Zedner,*
  547 U.S. 489 (2008)........................................... 18, 61, 62

*Wearry v. Cain,*
  136 S.Ct. 1002 (2016)..............................................56

*Wilson v. Garcia,*
  471 U.S. 261 (1985)..................................................48

*Wood v. Bartholomew,*
  516 U.S. 1 (1995)....................................................56

*Xiulu Ruan v. United States,*
  142 S.Ct.  (2022) ....................................... *passim*

**Statutes & Other Authorities:**

U.S. Const. amend VI ........................... 15, 40, 42, 43

U.S. Const. art. III, §2, cl. 3 ....................... 40, 41, 43

18 U.S.C. § 2106 ........................................ 54, 57, 65

18 U.S.C. § 2250 .......................................................42

18 U.S.C. § 3161 ............................................. 18, 61

18 U.S.C. § 3582 .......................................................47

18 U.S.C. § 3731 ............................................ 20, 64

18 U.S.C. § 666 ............................................. 28, 40

28 U.S.C. § 1291 ......................................................3

28 U.S.C. § 2106 ........................................ 3, 25, 65

28 U.S.C. § 2462 ................................................................................47

Fed. R. Crim. P. 12(b)(3)(B) ................................................ 24, 25, 30, 65

Fed. R. Crim. P. 18 ...................................................................... 40, 42

Charles Doyle, *Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law*, Congressional Research Service, CRS Report R41931 (July 21, 2011) .....26

H. Richard Uviller, Barker v. Wingo: *Speedy Trial Gets a Fast Shuffle*, 72 Colum. L. Rev. 1376 (1972) ...........................................................14

# INTRODUCTION

Twenty years ago, esteemed Harvard Law Professor Alan Dershowitz explained to Judge O'Toole and a packed court room (they were not there for Petitioner) just how constitutionally defective the Carpenter Indictment of February 2004 was. To remedy the multiple defects that Professor Dershowitz pointed out, the Government issued a Superseding Indictment in September 2004 that merely added the word "material" to seven paragraphs. If the Superseding Indictment was defective (as clearly it was based on Justice Breyer's Opinion in *Xiulu Ruan* below), then the District Court never had jurisdiction and Petitioner's unlawful conviction must be vacated. Moreover, Judge O'Toole did not have the benefit of *Irizarry-Colon* or *Handa* for measuring the severe Speedy Trial Act and Speedy Trial Clause violations in this case. The clock started ticking in February 2004 and there were six separate Speedy Trial Act violations and the longest Speedy Trial Clause violation in U.S. History as detailed by Judge Whitlock in his decision vacating the defendant's conviction in *United States v. El Naddaf*.

There were also a dozen other fundamental constitutional errors in this case, and many Due Process violations that caused Judge O'Toole to throw out not just one jury verdict but both jury verdicts (2005 and 2008) for egregious prosecutorial misconduct. The biggest Due Process violation was the delay from Petitioner-Carpenter losing the client funds in the NASDAQ Stock Market Crash of 2000 and

the first defective indictment of February 2004 and being sentenced ten years later in February 2014.

Interestingly, Petitioner's favorite stocks Qualcomm (QCOM) & Broadcom (AVGO) just hit all-time highs this week, as did the overall NASDAQ itself. As it stands, Petitioner's clients who lost $8,000,000 in invested funds received back $14,000,000 before the Second Trial of 2008 and altogether over $50,000,000 by 2015 from Petitioner's legal victories over PaineWebber and Merrill Lynch when the Client Exchangors formally released him and some even forgave him.

But the defective indictment does not mention – much less describe in detail – the required criminal *mens rea* or concurrence of an "evil thinking mind" with an "evil doing hand" as is required by our judicial system. If Judge O'Toole had the benefit of the Supreme Court's decision in *Kokesh* in 2017, then he would have realized that the documents at issue were drafted by Marty Paley in 1997 with his previous company – and not by Petitioner. So, if there was a crime here, it had to have happened in 1997 or 1998, and the Statute of Limitations for the case had run out sometime in 2003.

The First Circuit suggested that Petitioner's crime was not telling his clients he was investing in stock options. Now, with this Court's decision in the "Varsity Blues" case of *United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023) and the demise of the "Right To Control Theory of Fraud", there was no crime here. And if there

was no crime committed in the District of Massachusetts then Venue (*Salinas)* and Vicinage (*Smith*) was constitutionally improper in Massachusetts because whatever Petitioner did or did not do, he did in his office in Connecticut or with Merrill Lynch and PaineWebber in the Southern District of New York.

Therefore, there are a dozen fundamental errors in this case even before discussing that the Government put on eight witnesses who lied – and as Judge O'Toole said in his decision from 19 years ago – "and the Government knew it." Based on this Court's decision in *Ouimette v. Moran* where only the failure to disclose the defendant's partner's deal resulted in the conviction being vacated – it is time to utilize this Court's inherent power under 28 U.S.C. §2106 to vacate Petitioner's conviction and dismiss the indictment for the worst Speedy Trial violations in U.S. History.

## JURISDICTIONAL STATEMENT

This is an appeal from a judgment of the United States District Court for the District of Massachusetts (Hon. George O'Toole, Judge) denying the Petitioner's Motions to Reconsider pursuant to Rule 59(e) and Rule 60(b)(6) to vacate his conviction and a Motion for a Writ of Coram Nobis filed in 2021 that the Government never replied to. A timely notice of appeal was filed. This Court has jurisdiction under 28 U.S.C. § 1291.

# ARGUMENT

## I. THE COURT IS OBLIGATED TO VACATE A CONVICTION WHEN A PETITIONER IS ACTUALLY INNOCENT AND HAS SPENT SEVERAL YEARS IN CUSTODY FOR AN OFFENSE HE DID NOT COMMIT

Thirty-eight years ago, the Supreme Court stated that:

"[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *See Murray v. Carrier*, 477 U.S. 478, 496, (1986).

"In other words, a credible showing of actual innocence may allow a prisoner to pursue his constitutional claims (here, ineffective assistance of counsel) on the merits notwithstanding the existence of a procedural bar to relief. This rule, or the fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Herrera*, 506 U.S., at 404, 113 S.Ct. 853.

The Supreme Court has repeatedly applied the "miscarriage of justice" exception to overcome various procedural defaults which the Government continues to erroneously repeat 20 years after Petitioner's original indictment. These include "successive" petitions asserting previously rejected claims, *see Kuhlmann v. Wilson*, 477 U.S. 436, 454, (1986), "abusive" petitions asserting in a second petition claims that could have been raised in a first petition, *see, e.g. McCleskey v. Zant*, 499 U.S. 467, 494–495, (1991), failure to develop facts in state court, *see Keeney v. Tamayo–Reyes*, 504 U.S. 1, 11–12, (1992), and failure to observe state procedural rules,

4

including filing deadlines, *see*, *e.g. Coleman v. Thompson*, 501 U.S. 722, 750, (1991); *Carrier*, 477 U.S., at 495–496, 106 S.Ct. 2639.

The *Writ of Habeas Corpus* is of such fundamental importance to this nation's legal system that it is referred to as the "Great Writ." In the Framer's view, "freedom from unlawful restraint is a fundamental precept of liberty." The "vital instrument to secure that freedom was the *writ of habeas corpus*." *See Boumediene v. Bush*, 553 U.S. 723, 739 (2008).

Petitioner is also absolutely innocent as a matter of law pursuant to recent Supreme Court rulings, such as the 9-0 unanimous decision in *Xiulu Ruan v. United States*, 142 S. Ct. 3370 (2022), requiring specific intent "*mens rea*" in any indictment for fraud (decided on June 27, 2022); and in *Ciminelli v. United States*, 143 S. Ct. 1121 (2023), in which the Court foreclosed prosecutors' ability to pursue fraud charges for misrepresentations that did not intend to result in financial harm, but instead deprived victims of information that may have been useful in deciding how to use assets. Most importantly, this Court's decision in *Abdelaziz* means that the Petitioner did not commit a crime at all much less in the District of Massachusetts.

In fact, in a case very instructive here, the Fourth Circuit granted the Petitioner's *Writ of Coram Nobis* and vacated his 2003 conviction on July 14, 2022.

[T]he Court explained that **there is a presumption that collateral consequences flow from any criminal conviction.** *Id.* at 606. **And it recognized that "a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction."** *Id.* (quoting *Sibron v. New York*, 392 U.S. 40, 57, (1968)). We are persuaded by the sound reasoning of the Ninth Circuit. And we are also satisfied that the possibility that Lesane's invalid 2003 firearm conviction has actually impacted his sentence in the 2019 proceedings — or will affect a future one — is sufficient to satisfy the third coram nobis prong. Our analysis thus leads us to conclude that Lesane has satisfied the requirements for coram nobis relief and that the district court abused its discretion in denying the writ. We emphasize that an essential purpose of the coram nobis remedy, as Judge Widener explained in *Mandel*, is to "achieve justice." See 862 F.2d at 1074. **In order to achieve justice in this situation — where it is clear that the coram nobis petitioner is actually innocent, yet spent several years in custody for an offense he did not commit — we are obliged to set the record straight.** *United States v. Lesane*, No. 20-7144, 2022 WL 2720852, at *7 (4th Cir. July 14, 2022).

In *Lesane*, citing the Supreme Court's decision in *McQuiggin*, the Fourth

Circuit also noted that:

The Supreme Court recently recognized that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations." *See McQuiggin v. Perkins*, 569 U.S. 383, 386, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013). **In its** *McQuiggin* **decision, the Court ruled that AEDPA's statute of limitations can be overcome by a showing of actual innocence. Id. Nevertheless, the Court deemed relevant the existence of unjustified delay in the petitioner's efforts to obtain habeas corpus relief based on a showing of actual innocence. As the Court explained, "a federal habeas court, faced with an actual-innocence gateway claim, should count unjustifiable delay on a habeas petitioner's part, not as an absolute barrier to relief, but as a factor in determining whether actual innocence has been reliably shown."** *Id.* at 387, 133 S.Ct. 1924.

The Fourth Circuit's decision in *Lesane* also maintains that: "**it is difficult to imagine an error of a more fundamental character than a conviction for an offense the person did not commit. *See, e.g., McQuiggin*, 569 U.S. at 392, 133 S.Ct. 1924 (explaining that fundamental miscarriage of justice occurs when an innocent person is convicted).** *United States v. Lesane*, No. 20-7144, 2022 WL 2720852, at *7 (4th Cir. July 14, 2022). Respectfully, Petitioner's case is stronger and the harm done to his family and career was more severe than in *Lesane*.

Moreover, on June 30, 2022 the Supreme Court granted four different Writs attacking the Second Circuit's "Right to Control Theory" of Fraud. See *Ciminelli* and *Percoco* discussed in depth below. The decisions were announced on Friday July 1st and the Petitioners were released from prison the next day on a Saturday. Petitioner has respectfully asked for the same immediate issuance of the Writ as was done in *Ex Parte Merryman*, 17 F. Cas. 144 (1861)—in two days during the Civil War. Petitioner has made his case that he never spoke to the Exhchangors in the Boston case and never lied to anyone about anything at any time. The Superseding Indictment of September 2004 backs up Petitioner on that claim—and after the Supreme Court's decision in *Skilling v. United States,* 561 U.S. 358 (2010) that "Nondisclosure is outside the bounds of the Fraud statutes," the failure of Petitioner to not disclose his trading in stock options is not a crime. Petitioner has paid back the Exchangors $50,000,000 on his $8,000,000 loss, thanks to his legal victories over

PaineWebber and Merrill Lynch. Petitioner was released by all of the Exchangors in 2015, and actually forgiven by several while he was in prison for a "noncrime" that he did not commit.

In 2004, when Professor Dershowitz explained to the Court the defects of the original indictment, the Government merely added the word "material" to seven paragraphs, thereby "broadening" the untimely September 2004 Superseding Indictment. That is all. They did not add the words "*in furtherance of the fraud*" or "*duty to disclose*" or "*specific intent to defraud*" or "*scienter*" or the phrase "*mens rea*" to express the concurrence of an "*evil thinking mind*" with an "*evil doing hand*", as is required for a federal crime in this country. *See Morissette* citing *McBoyle*, 342 U.S. 246, 250–252, (1952), as well as Justice Breyer in *Xiulu Ruan* below.

As the Fourth Circuit concluded in granting the Writ of Coram Nobis in *Lesane*, "**it is time to set the record straight**".

## II.    THE SUPREME COURT'S UNANIMOUS DECISION IN
##        *XIULU RUAN* IS ALSO DISPOSITIVE IN THIS CASE

On June 30, 2022 the Supreme Court granted Certiorari in four different Writs attacking the Second Circuit's "Right to Control Theory" of Fraud. The decisions were announced on Friday July 1st and the Petitioners were released from prison the next day on a Saturday. Petitioner has respectfully asked for the immediate issuance of the Writ as was done in *Ex Parte Merryman*, 17 F. Cas. 144 (1861)—in two days during the Civil War.

Prior to that on June 27, 2022 the Supreme Court vacated the conviction of a doctor, who thought he was writing legal prescriptions, with Justice Breyer writing for a 9-0 unanimous Supreme Court in *Ruan*:

> **First as a general matter, our criminal law seeks to punish the "vicious will." *Morissette v. United States*, 342 U.S. 246, (1952); With few exceptions, "wrongdoing must be conscious to be criminal." *Elonis v. United States*, 575 U.S. 723, 734, (2015) (quoting *Morissette*, 342 U.S. at 252, 72 S.Ct. 240).** Indeed, we have said that consciousness of wrongdoing is a principle "as universal and persistent in mature systems of [criminal] law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil."
>
> **Consequently, when we interpret criminal statutes, we normally "start from a longstanding presumption, traceable to the common law, that Congress intends to require a defendant to possess a culpable mental state." *Rehaif v. United States*, 588 U. S. ——, ———, 139 S.Ct. 2191, 2195, (2019). We have referred to this culpable mental state as "scienter," which means the degree of knowledge necessary to make a person criminally responsible for his or her acts. *Morissette*, 342 U.S. at 250–252, 72 (1952)**

Analogous precedent reinforces our conclusion. In *Liparota*, we interpreted a statute penalizing anyone who " 'knowingly uses [food stamps] in any manner not authorized by' " statute. 471 U.S. at 420, 105 S.Ct. 2084. We held that "knowingly" modified both the "use" of food stamps element and the element that the use be "not authorized." *Id*., at 423, 433, 105 S.Ct. 2084. We applied "knowingly" to the authorization language even though Congress had not "explicitly and unambiguously" indicated that it should so apply. *Id*., at 426, 105 S.Ct. 2084. But if knowingly did not modify the fact of nonauthorization, we explained, the statute "would ... criminalize a broad range of apparently innocent conduct." *Ibid*.

Finally, in *Rehaif*, we interpreted a statutory scheme in which one statutory subsection provided penalties for anyone who "knowingly violates" a separate subsection. To convict under the statute, then, the Government had to prove that a defendant knew he had one of the listed statuses. Ibid. "Without knowledge of that status," we reasoned, "the defendant may well lack the intent needed to make his behavior wrongful," because "[a]ssuming compliance with ordinary licensing requirements, the possession of a gun can be entirely innocent." *Ruan v. United States*, No. 20-1410, 2022 WL 2295024, at 5-6 (U.S. June 27, 2022).

As anyone can clearly see—**none of the requirements** concerning scienter, *mens rea*, or "knowingly" violating a statute, that Justice Breyer speaks of as constitutionally required can be found in Petitioner's Original Indictment of February 2004 or his Superseding Indictment of September 2004.

## III.   SOMETHING MORE ENERVATING THAN HELL

Justice in the First Circuit should not come down to which Judge you draw. Recently, several different Judges in Boston have granted a "guilty" person's Motion to Dismiss his indictment for violations of the Speedy Trial Clause of the

Constitution for delays of a mere four years, citing Petitioner's case (as most Speedy Trial cases do), *United States v. Carpenter*, 781 F. 3d 599 (1st Cir. 2015). This is particularly significant as the First Circuit in *United States v. Carpenter* describes very well the "Living Hell" that Petitioner has suffered at the hands of the Government for the past 20 years, and an "apology" is just not good enough for a clear violation of the Constitution yet again in this case:

> **Carpenter's argument instead focuses on the anxiety he suffered throughout the proceedings. His brief, supported by record materials, describes a "living hell" of lost business opportunities, financial stress, sleeplessness, panic attacks, and the like.** He points, however, to no opportunities that would not have been lost as well in the wake of a speedier conviction. And while anxiety about the outcome of post-conviction motions and appeals is no doubt real, anxiety is a normal part of the pendency of criminal charges. It therefore becomes a sign of prejudice only when "undue pressures" exist. **While Carpenter argues convincingly that he has suffered great stress throughout the proceedings, he does not demonstrate why his anxiety was greater than that suffered by many other defendants, other than that it continued longer. While it may be possible that post-conviction delay could result in prejudice by shifting the time period in which a defendant serves his sentence, Carpenter makes no such argument here.** In sum, while the length of delay causes us to presume some prejudice, we find nothing in this record to establish that Carpenter suffered a type of prejudice that would take on added weight in our assessment of the constitutionality of that delay. While the travel of the case as a whole was remarkable, its length arose almost entirely because the district court exercised (and exceeded in one instance) its discretion in granting Carpenter relief from verdicts against him. In the end, we have an unjustified delay of roughly twenty-one months, which occurred after a guilty verdict was returned and without any meaningful fault of the government. **While the delay was unfortunate, it did not impair the defense, create any undue pressure, or result in any period of incarceration.** *United States v. Carpenter*, 781 F.3d 599, 614–15 (1st Cir. 2015).

At the risk of having the government claim once more that Petitioner is simply "repackaging" again – Rocky Moore (another convicted killer like Duane Buck) had his conviction vacated by the Supreme Court for a delay of only 28 months, which happens to be shorter than Petitioner's "Speedy Trial Delay" from June 2008 – September 2011:

> "Inordinate delay, wholly aside from possible prejudice to a defense on the merits, may seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . **may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends**." *Moore* at 27, *citing United States v. Marion*, 404 U.S. 307, 320-21 (1971).

Once again, Petitioner respectfully suggests that he is the "One Innocent Person" out of 100 that Ben Franklin was warning us all to protect – and was a three-decade victim (perhaps even "poster-child") of "Public Obloquy" because of the Government's actions and the First Circuit's "inaction" in Petitioner's case. As Judge Whitlock stated in *El Nadaff*:

> Length of delay analysis requires a "double enquiry," ***Doggett* v. *United States*, 505 U.S. 647, 651-52, (1992), because it is both a "triggering mechanism for the rest of the [speedy trial] analysis, and *a* factor in that analysis," *Handa*, 892 F.3d at 101 (quoting *United States* v. *Carpenter*, 781 F.3d 599, 609 (1st Cir. 2015)).** To establish at the outset that a speedy trial inquiry is necessary, "a defendant must allege that the time between accusation — whether by arrest or indictment — and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay." *Handa*, 892 F.3d at 101 quoting *United States* v. *Irizarry-Colón*, 848 F.3d 61, 68 (1st Cir. 2017)). **The First Circuit has held that a "[d]elay of around one year is considered presumptively prejudicial, and the presumption that delay prejudices the defendant 'intensifies over time.'" *Carpenter*, 781 F.3d at 610 (quoting *Doggett*, 505 U.S. at 652, 112 S. Ct. 2686).** For

*Barker* factor one purposes, the delay period is calculated using the date that the defendant is "indicted, arrested, or otherwise officially accused" as its start date. **It is inadequate to leave matters in this case with the observation that "the delay was unfortunate, [but] it did not impair the defense, create any undue pressure, or result in any period of incarceration."** *Carpenter*, **781 F.3d at 615. The delay here did something more enervating; it deprived the defendant of his fundamental constitutional right to a speedy and public trial.** *United States v. El Naddaf*, No. CR 13-10289-2-DPW, 2023 WL 2541555, at *24 (D. Mass. Mar. 16, 2023).

Judge Whitlock goes on to make a number of points citing *United States v.*

*Carpenter:*

Here, each of the four *Barker* factors in varying degrees weighs in favor of finding a violation of Mr. El Naddaf's Sixth Amendment right to a speedy trial. Together, they overcome the hurdles *Doggett* identified for a defendant to surmount in establishing a speedy trial claim. **It is inadequate to leave matters in this case with the observation that "the delay was unfortunate, [but] it did not impair the defense, create any undue pressure, or result in any period of incarceration."** *Carpenter*, **781 F.3d at 615. The delay here did something more enervating; it deprived the defendant of his fundamental constitutional right to a speedy and public trial.**

Having conducted a full four factor *Barker* analysis as directed by *Doggett* and governing First Circuit law shaped by the Supreme Court's modern cautious, step-by-step and ad hoc approach to addressing constitutional speedy trial claims, I am not unaware of the tensions created by the interests at play. That constitutional protections are principally directed at securing for an accused the right to a speedy and public trial. That constitutional provision also serves to secure for the community a speedy and public resolution of criminal charges. **Yet the decision to move the case to trial deprives the defendant of the right to avoid trial altogether when his speedy trial rights have been breached.** In addressing the issues in this case, I was impelled by the conclusion that a meaningful balancing test here required such a trial. **With the benefit of the full record it created, I am satisfied that Mr. El Naddaf has been deprived of his constitutional speedy trial rights and that this deprivation provides an alternative ground for a judgment terminating this case.** *United States v. El Naddaf,*

No. CR 13-10289-2-DPW, 2023 WL 2541555, at *24 (D. Mass. Mar. 16, 2023).

In *Doggett* v. *United States*, the Supreme Court twice cited a law review article as instructive, H. Richard Uviller, Barker v. Wingo*: Speedy Trial Gets a Fast Shuffle*, 72 Colum. L. Rev. 1376 (1972). *See Doggett* v. *United States*, 505 U.S. 647, 652 n.1 & 658 n.4, 112 S. Ct. 2686, 120 L.Ed.2d 520 (1992). There, Professor Uviller explored, *inter alia*, the "[r]ealistic[ ]" application of prejudice in the *Barker* analysis, explaining that "prejudice lies beyond the capacity of either side to prove or disprove, except in the rare instance where a known defense witness of known competence actually disappears or reports a recent impairment of memory, and no prior testimony from him is available." Uviller, *supra*, at 1394-95. **As a result, "the shift of burden actually permits the presumption of prejudice to prevail on the issue," though "[t]he establishment of [presumptive] prejudice ... does not end the inquiry; it merely focuses attention on other elements wherein impropriety or justification may be more meaningfully discerned." *Id.* at 1395.**

Judge Whitlock then describes Judge Lipez's famous Opinion in *Velazquez*

for the Third Circuit which Petitioner-Carpenter actually mentioned to the First

Circuit in 2014:

Judge Lipez, a First Circuit judge sitting by designation on the Third Circuit "note[d] that, in citing the ... [Uviller] passage for support, the *Doggett* Court was keenly aware of the practical difficulties for the prosecution in making such a rebuttal." *United States* v. *Velazquez*, 749 F.3d 161, 185 n.23 (3d Cir. 2014). **In fact, "[t]he [Supreme] Court [in *Doggett*] thus indicated that the government faces a high, and potentially insurmountable, hurdle in seeking to disprove general prejudice where the period of delay is extraordinarily long." *Id.* at 185. Although I have concluded Mr. El Naddaf did not establish specific prejudice, I conclude the government has failed to rebut the inherent prejudice of a nearly five-year delay, during which no steps were taken to make Mr. El Naddaf aware of the charges against him.**
**I further note that in sitting by designation on the Third Circuit, Judge Lipez deployed a somewhat different standard of review formulation from the one applied by the First Circuit, which has "repeatedly**

14

reviewed district court rulings for abuse of discretion," *United States* v. *Carpenter*, 781 F.3d 599, 607 (1st Cir. 2015). This formulation "varies from that used in most other circuits," including the Third Circuit in *Velazquez*, "which review such claims de novo, albeit while applying clear error review to the district court's factual findings." *Id.* The different formulations do not appear to be material for purposes of my own responsibilities for nisi prius analysis in this case. *United States v. El Naddaf*, No. CR 13-10289-2-DPW, 2023 WL 2541555, at *23 (D. Mass. Mar. 16, 2023).

Judge Whitlock also does an excellent review of the protections guaranteed

by the Sixth Amendment – none of which have protected Petitioner in the

"unfriendly" forum of Boston:

The Sixth Amendment protects a defendant's right to a prompt resolution of criminal charges against him by providing "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial ...." U.S. Const. amend VI. The right to a speedy trial "is one of the most basic rights preserved by our Constitution." *Klopfer* v. *North Carolina*, 386 U.S. 213, 226, 87 S. Ct. 988, 18 L.Ed.2d 1 (1967). **This fundamental constitutional protection recognizes "the general concern that all accused persons be treated according to decent and fair procedures."** *Barker* v. *Wingo*, 407 U.S. 514, 519, (1972).
As the Supreme Court has explained, the Sixth Amendment speedy trial right is "generically different from any of the other rights enshrined in the Constitution for the protection of the accused." The Sixth Amendment implicitly recognizes that pretrial delays "might result in witness unavailability and fading memories, which may prejudice both defendants and prosecutors." (But the constitutional right to a speedy trial must also be read to "promote the interests of rehabilitation, minimize the amount of time potentially dangerous individuals are free on bond, prevent oppressive pretrial incarceration, **minimize anxiety and concern of the accused, and shorten the disruption of life caused by arrest and the presence of unresolved criminal charges**." *Id.* In determining whether a defendant's Sixth Amendment right to a speedy trial has been violated, I am directed to engage in an "ad hoc" balancing test involving the following factors set out by the Supreme Court in *Barker*: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407

15

U.S. at 530, 92 S. Ct. 2182. The First Circuit cautioned some thirty years ago that "[t]hese factors cannot be plugged into a formula that operates with scientific precision. Rather they must be considered on a case-by-case basis 'together with such other circumstances as may be relevant.'" *United States v. El Naddaf*, No. CR 13-10289-2-DPW, 2023 WL 2541555, at *15–16 (D. Mass. Mar. 16, 2023).

Furthermore, there is no other case in any circuit in this Country that can match the Due Process delays in this case. Petitioner asks this Court to focus on the extraordinary Due Process delays in this case pursuant to the Barker factors as suggested by Justice Sotomayor in her Opinion in *Betterman v. Montana*, 136 S.Ct. 1609 (2016). Viewing Petitioner's now 20 year-long "Kafkaesque" odyssey with the vision provided by *Betterman*, his preindictment delay of four years was longer than the delay in *Marion*, the inexplicable delay from June 2008 to September 2011 was longer than the delay in *Moore*, and now his total Due Process delay is more than double the seven-year delays of *United States v. Loud Hawk*, 474 U.S. 302 (1986) and *Doggett*. Now that the Supreme Court has clearly laid out the rules of Due Process in *Betterman*, this Court cannot ignore the clear violation of Petitioner's Constitutional rights.

Petitioner respectfully asserts that there was no fraud in this case as a matter of law, nor did he have the "Fair Warning" in his indictment which is the cornerstone of American jurisprudence. But even assuming, arguendo, that Petitioner did something wrong or illegal, he certainly did not receive a fair trial in either of his two trials in 2005 and 2008. Because of the pre-indictment delay

between January of 2001 and September of 2004, and the post-trial Due Process

delay between sentencing of almost six years and the total Due Process delay of 15

years, it is Petitioner who should have the landmark case for both violations of the

Due Process Clause under *United States v. Lovasco*, 431 U.S. 782 (1977) and *United

States v. Marion*, 404 U.S. 307 (1971). In fact, it is significant that the delay of 39

months from Petitioner's trial in 2008 through September 2011 - when Judge

O'Toole granted Petitioner's second new trial order - was longer than the delay for

convicted murderer Rocky Moore. *See, e.g., Moore v. Arizona*, 414 U.S. 25 (1973):

> Moreover, prejudice to a defendant caused by delay in bringing him to
> trial is not confined to the possible prejudice to his defense in those
> proceedings. Inordinate delay, "wholly aside from possible prejudice
> to a defense on the merits, may `seriously interfere with the defendant's
> liberty, whether he is free on bail or not, and . . . may disrupt his
> employment, drain his financial resources, curtail his associations,
> subject him to public obloquy, and create anxiety in him, his family
> and his friends.' These factors are more serious for some than for
> others, but they are inevitably present in every case to some extent, for
> every defendant will either be incarcerated pending trial or on bail
> subject to substantial restrictions on his liberty." *Moore* at 27, citing
> *Marion* at 320-21.

The delay in this case also exceeds that of *United States v. Handa*, 892 F.3d

95 (1st Cir. 2018) and *United States v. Irizarry-Colon*, 848 F.3d 61 (1st Cir. 2017)

combined, so that Petitioner's conviction and indictment should be vacated.

Ironically, those two seminal cases in the First Circuit both cite Petitioner's case. *See

Handa* at 101, citing *United States v. Carpenter*, 781 F.3d 599, 610 (1st Cir. 2015)

("[d]elay of around one year is considered presumptively prejudicial, and the

presumption that delay prejudices the defendant intensifies over time."), and *Irizarry- Colon* at 68 (same). The Speedy Trial violations in this case are also not a close call as there was no reason for the delay from June 2008 to May 2015, nor was there any balancing tests done in the interests of justice. See *United States v. Zedner*, 547 U.S. 489, 507 (2008). Starting in 2005, Petitioner-Carpenter had six different Speedy Trial Act motions all denied for clearly erroneous reasons.

Moreover, the now familiar *Barker* factors that Justice Sotomayor stated in *Betterman*, and the seven-year delay between Petitioner's second trial in June 2008 and the First Circuit's decision in May 2015 (ignoring fundamental legal principles of not only the First Circuit but the Supreme Court as well), mandates that Petitioner's indictment and conviction be vacated. There were no reasons placed on the docket as required by §3161(h)(7) and the Supreme Court's decision in *Bloate v. United States*, 559 U.S. 196 (2010). Thus, the extraordinary delay in Petitioner's case is far longer than any delay in *United States v. Dezeler*, 81 F.3d 86 (8th Cir. 1996) (delay of only one day); *United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011) (delay of only 16 days), and *Bloate and United States v. Tinklenberg*, 131 S.Ct. 2007 (2011) (delays of only 9 days). As the Supreme Court has explained, "The relevant provisions of the Act are unequivocal," and "[t]he sanction for a violation of the Act is dismissal." *Zedner* at 507, 509. If "the trial does not begin on time, the indictment or information must be dismissed." Id. at 508. At this point,

all of the Exchangors have been paid back many times their original losses, almost $50 million on an $8 million loss in the great NASDAQ stock market crash of 20 years ago. The Exchangors received $14,000,000 before Petitioner's Second Trial in 2008 and fully released Petitioner in 2015, yet the First Circuit did not even void the Forfeitures Order against Petitioner.

Petitioner hereby requests that this Honorable Court do the same calculation that was done for the defendant in *Irizarry-Colon* and arrive at the same conclusion and grant the Writ, thereby setting aside Petitioner's conviction and dismissing his indictment with prejudice for violations of the Speedy Trial Clause. Unlike the defendant in *Handa*, Petitioner has lived in the same house in Connecticut and has been under Government investigation or supervision for the past 20 years since he lost the Exchangors' money in the NASDAQ Stock Market Crash of 2000. Petitioner would also like to emphasize the Third Circuit opinion in *United States v. Velazquez*, 749 F.3d 161 (3d Cir. 2014) written by Judge Lipez of First Circuit fame, where he reviews the six-year delay in bringing Velazquez, a notorious drug dealer and dangerous criminal, to trial. Velazquez was either evading justice (the government's view) or was just a transient individual (Third Circuit's view) when he was arrested in California and shipped back to Philadelphia on an old arrest warrant.

Meanwhile, Petitioner was dutifully checking in with pre-trial services for the

14 years leading up to his sentencing, including the five-year delay from 2008 until his new trial order was overturned in 2013. Velazquez pled guilty while preserving his Speedy Trial claim and was sentenced to 87 months. In vacating his conviction and sentence for violations of the Speedy Trial Clause, Judge Lipez discussed the second of the Barker factors: who is responsible for the delay, which is the "flag that all litigants seek to capture," *Loud Hawk* at 315:

> "Negligence over a sufficiently long period can establish a general presumption that the defendant's ability to present a defense is impaired, meaning that a defendant can prevail on his claim despite not having shown specific prejudice. This general presumption applies because impairment of one's defense is the most difficult form of Speedy Trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown. Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett* at 655.

In other words, Judge Lipez describes exactly what happened in this case; the theory of "presumptive prejudice" because of the number of extensive delays in this case. Unlike any of these other defendant's, Petitioner's conviction, unlike anyone else, was dismissed three years after his second trial in 2008. But the Government decided to violate the "Double Jeopardy" clause of 18 U.S.C. §3731 that prevents the government from doing an appeal, and that took another two years. Petitioner's family has also suffered through this ordeal not only by numerous lost business opportunities and banks severing ties with them, but simply through the personal pain of watching their loved one suffer while incarcerated and through

relentless litigation by the government. *United States v. Ferreira*, 665 F.2d 701 (6th Cir. 2011), *Dixon v. White*, 210 Fed. Appx. 498 (6th Cir. 2007), *United States v. Erenas-Luna*, 560 F.3d 772 (8th Cir. 2009), *United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006), and the policy behind Speedy Trial rights support a conclusion that both the negligence that the Government exhibited and the significant length in the several separate delays warrant the dismissal of the Indictment in this case with prejudice as well as vacating Petitioner's conviction.

## IV. THE DISTRICT COURT LACKED SUBJECT MATTER JURISDICTION

Recently, this Court vacated the conviction of a person who pleaded guilty because the District Court may not have had jurisdiction and the indictment did not specify the exact elements of the crime. This was considered Plain Error. In *United States v. Guzman-Merced,* 2020 WL 7585176 (1st Cir. 2020), this Court found there was Plain Error and reversed the 924(c) convictions of two convicted felons based on the Supreme Court's decision in *Rehaif v. United States*, 139 S.Ct. 2191 (2019). Petitioner has clearly satisfied the standards of Plain Error as stated in *United States v. Lara,* 970 F.3d 68, 84 (1st Cir. 2020) *citing United States v. Rosa-Ortiz*, 348 F.3d 33, 36 (1st Cir. 2003):

> "[a] federal court lacks jurisdiction to enter a judgment of conviction when the indictment charges no offense under federal law. These challenges raise a number of questions about the application of the plain error standard of review,

which provides that a clear or obvious error should be corrected if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 138 S.Ct. 1897, 1905 (2018) (*quoting Molina-Martinez v. United States*, 136 S.Ct. 1338, 1343 (2016)).

The Supreme Court has made it clear that subject matter jurisdiction can be challenged any time, even after a judgment had been rendered. *See Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514 (2006). As this Court determined in *United States v. Bravo-Fernandez*, 913 F.3d 244 (1st Cir. 2019), which has not been going on as long as this case, the Government failed to allege and prove at trial **only one** essential jurisdictional element of the crime so the conviction had to be set aside and the indictment had to be dismissed. Petitioner submits to this Court that, based on the First Circuit's decisions in *Bravo-Fernandez*, *Tavares*, *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017) and especially *Abdelaziz* based on the Supreme Court's decisions in *Skilling* and *Chiarella,* the District Court lacked subject matter jurisdiction because Petitioner's indictment lacked all five essential elements of the Mail and Wire Fraud statutes, and therefore the Petitioner's conviction should be set aside based on *United States v. Rosa-Ortiz*, 348 F.3d 33 (1st Cir. 2003), which was based on *United States v. Peter*, 310 F.3d 709 (11th Cir. 2002), which in turn was based on the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000), which was the basis for the Supreme Court's recent unanimous decision in *Kell*y *v. United States.* The reason the District Court did not have jurisdiction is because just like in *Rosa-Ortiz*, the alleged conduct in the indictment did not establish a federal crime. In *Rosa-Ortiz*, the indictment

charged the defendant with conspiring to violate Section 751(a) by assisting in the escape of his co-defendant who was in federal custody on a federal material witness warrant. The defendant pleaded guilty to that charge and appealed, arguing that his conduct was not within the crime charged. Furthermore, it is black-letter law that a defective indictment does not invoke the jurisdiction of the federal courts and any decision by a District court that lacks jurisdiction is a nullity and is void as a matter of law.

In this Appeal, Petitioner raises several separate arguments. First, the District Court lacked jurisdiction because just as in *Peter*, the law of mail and wire fraud was changed by the Supreme Court's decisions in *Cleveland, Skilling*, and *Kelly*; and just as the defendant in *United States v. Guzman-Merced,* 2020 WL 7585176 (1st Cir. 2020) benefited from the Supreme Court's decision in *Rehaif v. United States*, 139 S.Ct. 2191 (2019), the Petitioner respectfully asserts that the Supreme Court's unanimous decisions in *Kelly* - and certainly in *Skilling*(cited in *Abdelaziz*) - changed forever the requirements of mail and wire fraud because "[N]ondisclosure is outside the bounds of the fraud statutes." *Skilling* at 400. Additionally, based on the First Circuit's decision in *Tavares,* since none of the mailings in that case were in furtherance of any crime, clearly there could be no mail or wire fraud in Petitioner's case, and since the indictment failed to properly state all of the elements of a federal crime, it was therefore constitutionally and fatally defective.

The District Court also lacked jurisdiction pursuant to Fed.R.Crim.P. 12(b)(3)(B) because the Indictment failed to allege all of the facts necessary to constitute a federal offense, and because the Indictment failed to charge Mail and Wire Fraud with the particularity needed to invoke the Court's jurisdiction, this was plain error under the standards set by the Supreme Court in its decision in *Rosales-Mireles v. United States,* 138 S.Ct. 1897 (2018) *citing Molina-Martinez v. United States*, 136 S.Ct. 1338 (2016). In this case, Petitioner's Indictment was woefully inadequate as to all five elements that must be sufficiently alleged to establish a federal crime. Since both of Petitioner's indictments were in 2004, they must be considered under the old Rule 12(b)(3)(B) prior to the change in December 2014. Petitioner's challenge to jurisdiction is still timely and meritorious. Therefore, the indictment was either constructively amended or failed to state a federal crime at all and thus, the indictment must be dismissed and a Writ of Audita Querela issued. Significantly, in issuing the appropriate Writ, the Court must take notice of the fact there was never a failure to make an exchange until after January 2001 when PaineWebber swept all the funds from the BPETCO account. As this Court knows well, failure to complete an agreement does not constitute fraud.

Third, unlike the lying physicians in *Berroa*, Petitioner never lied to any of the Exchangors about anything at any time, and in fact had no communication whatsoever with any of the Exchangors, so there was no lie, deception, or scheme to defraud.

Finally, as the Government failed to prove only one essential element charged in *Bravo-Fernandez*, Petitioner respectfully submits that the Government failed to prove any – much less all five required – essential elements of Mail and Wire Fraud in this case, and therefore Petitioner's conviction should be set aside. With that in mind, Petitioner respectfully asks this Court to exercise its powers to immediately vacate Petitioner's conviction under 28 U.S.C. § 2106, or a dismissal of the indictment pursuant to the old Rule 12(b)(3)(B) prior to December 2014 as the indictment was fatally deficient and failed to state a crime just as the indictment in *Peter* did where the conviction was vacated under a Writ of Coram Nobis.

Similarly, in the "Bridgegate" case of *Kelly v. United States*, the Supreme Court made it clear that the intent to acquire someone else's property using deceit must be at the core of the charged criminal act:

> But that property must play more than some bit part in a scheme: It must be an "object of the fraud." Or put differently, a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme. Without that rule, as Judge Easterbrook has elaborated, even a practical joke could be a federal felony. See *United States v. Walters*, 997 F.2d 1219, 1224 (CA7 1993). His example goes: "A [e-mails] B an invitation to a surprise party for their mutual friend C. B drives his car to the place named in the invitation," thus expending the cost of gasoline. "But there is no party; the address is a vacant lot; B is the butt of a joke." Wire fraud? No. And for the reason Judge Easterbrook gave: "[T]he victim's loss must be an objective of the [deceitful] scheme rather than a byproduct of it." *Id.*, at 1226.

In his highly regarded report to Congress on mail and wire fraud dated July 21, 2011, Charles Doyle of the Congressional Research Service, states that all five

of the elements of mail and wire fraud that must be alleged in an indictment and

**proven beyond a reasonable doubt** before someone can be convicted:

(1)     Used either mail or wire communications **in the foreseeable furtherance**,
(2)     of a **scheme to defraud**,
(3)     involving a **material** deception,
(4)     with the **intent to deprive** another of,
(5)     either **property** or honest services.

*See* Congressional Research Service, CRS Report R41931*, Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law*, by Charles Doyle, July 21, 2011. Failure to properly allege each and every one of these elements with sufficient facts renders an indictment facially invalid and does not properly invoke the jurisdiction of the federal courts. "Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *United States v. Russell*, 369 U.S. 749, 764 (1962). Suffice it to say, the Government did not prove **any of these five elements** at Petitioner's trial, much less proving **all five** beyond a reasonable doubt as Charles Doyle's 2011 Report to Congress says it is required to do. Therefore, as with the defendants in *Bravo-Fernandez*, Petitioner's conviction should be set aside.

Petitioner's Indictment is also devoid of any *specific* intent to defraud, or the required "tangible economic harm." In fact, the words "*mens rea*," "scienter," and even the "specific intent to defraud" are nowhere to be found in the Indictment, even

though those words are required by the US Attorney's Manual. *See USAM Chapter 9-43.000, Criminal Resource Manual at 948*. As the Eleventh Circuit explained in dismissing the indictment and vacating the conviction in *Peter*:

> The problem is not that the Government's case left unanswered a question whether its evidence would encompass a particular fact or element. But that the Government affirmatively alleged specific conduct that is outside the reach of the mail fraud statute. Peter's innocence of the charged offense appears from the very allegations made in the superseding information, not from the omission of allegations requisite to liability. *Peter* at 715.

That is precisely the problem with the Indictment in Petitioner's case. Each count of the Indictment that charges Petitioner with an alleged federal crime merely parrots the language of the Mail and Wire Fraud statute without any details of what makes Petitioner's **own personal** conduct criminal, there was no conspiracy charged in this case, so it is only the personal conduct of Petitioner that is at issue. More importantly, none of the counts allege facts that would bring Petitioner's conduct within the meaning of the Mail and Wire Fraud statutes under any circumstances after *Skilling* and *Tavares*. As this Court stated in *Rosa-Ortiz*, "a federal court has jurisdiction to try criminal cases only when the information or indictment alleges a violation of a valid federal law. *United States v. Saade*, 652 F.2d 1126, 1134 (1st Cir. 1981)." A federal court similarly lacks jurisdiction to enter a judgment of conviction when the indictment charges no offense under federal law whatsoever. *See Peter*, *citing United States v. Morgan*, 346 U.S. 502 (1954), where the Eleventh Circuit made it unequivocally clear that:

**"When a court without jurisdiction convicts and sentences a defendant, the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force**." *Peter* at 715.

That is precisely the problem in this case. Each count of the Indictment that charged Petitioner with an alleged federal crime in 2004 merely parroted the language of the Mail and Wire Fraud statutes without any details of how Petitioner's conduct was criminal. None of the counts alleged facts that would bring Petitioner's conduct within the meaning of the charged statutes at the time, and certainly not under any circumstances after *Skilling*, *Tavares*, and *Bravo-Fernandez*. For example, none of the mailings or wires were done or caused by Petitioner, and none of the mailings and wires were done in *furtherance* of a scheme to defraud. Only a select set of frauds reach the level required for a Mail and Wire Fraud prosecution. Specifically, in this case, the government failed to allege all five elements necessary to invoke a federal court's jurisdiction.

Just as this Court determined in 2019 that the original indictment in *Bravo-Fernandez* failed to allege and the government failed to prove only one of the essential jurisdictional elements under 18 U.S.C. §666, so too does the Petitioner want to point out to the Court that the indictment of 2004 was missing all of the jurisdictional elements necessary for mail and wire fraud according to Charles Doyle, including the fact that there was no mention of intent, *mens rea*, or scienter anywhere in the indictment or at both trials. Moreover, the Government failed to prove any of the

elements, much less all five elements at trial. Petitioner, therefore respectfully asks this Court to review the case not in the lens of December 2005, but rather through the lens of the First Circuit and Supreme Court cases in 2024. Furthermore, as this Court stated in *United States v. Valdes-Ayaya*, 900 F.3d 20 (1st Cir. 2018):

> That leaves the fourth prong of plain error review-whether the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." The Supreme Court has recently made this an easy decision for us. In *Rosales-Mireles*, the Court held that, "[i]n the ordinary case, the failure to correct a [plain error] that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings." *Id*. at 43. Just as the Writ of Coram Nobis in *Peter* was based on the Supreme Court's

decision in *Cleveland v. United States*, 531 U.S. 12 (2000) that changed the rules of mail and wire fraud, so too did the Supreme Court's unanimous decision in *Skilling* further change the rules of mail and wire fraud in 2010. Since the District Court's decision on most of these major issues was written in December 2005, Petitioner would like to respectfully request that this Court review the constitutionally defective indictment of 2004 through the lens of recent Supreme Court in 2023 and First Circuit cases like *Abdelaziz*, rather than the District Court's view of law in December 2005 when the last major detailed analysis of this case was written.

As these recent cases like *Abdelaziz* and *Bravo-Fernandez* make clear, an indictment that merely tracks the language of a charged statute and alleges vague criminality *but alleges no facts that actually violate the statute it charges* cannot be sustained. Therefore, based on the fact that both indictments in this case failed to

allege a federal crime under *Xiulu Ruan* or allege any mailings or wires in furtherance of any fraud, like *Tavares*, the Court lacked jurisdiction which is an error of "fundamental" proportions requiring the vacating of Petitioner's conviction or dismissal of the Indictment for a lack of jurisdiction and for failure to describe a federal crime pursuant to the old Rule 12(b)(3)(B) prior to December 2014.

## V. PETITIONER'S CONVICTION MUST BE SET ASIDE BASED ON *ABDELAZIZ*

As this Court summed up Petitioner's alleged crime in denying his appeal in 2015:

> In a nutshell, Petitioner told clients he would hold their money in escrow accounts for which the client would pay a fixed fee and which would cautiously generate returns of either three or six percent; then (unbeknownst to his clients) he invested the money in high-risk, high-return stock options, hoping to generate excess returns to keep for himself. His option trading fared poorly, and he lost nine million dollars in client funds. At trial, he argued unsuccessfully that he never promised that the client funds would be safe, and that he did not intend to defraud his clients when he failed to disclose his real strategy of using their money to make risky investments to see if he could hit a home run for himself. *United States v. Carpenter*, 781 F.3d 599, 603 (1st Cir. 2015).

Despite all of the obvious errors in this Court's "nutshell" description (e.g. Petitioner did not *tell* anyone anything in this case and there were extensive contractual agreements so all of the Exchangors were bound by a contract with a merger and integration clause), the immediate problem with this Court's description of the scheme to defraud in Petitioner's case is that it fails to describe a crime anywhere in the United States after the Supreme Court's unanimous decision in *Skilling v. United States*, 561 U.S. 358 (2010) as cited in *Abdelaziz*. For example,

30

*Skilling* describes the classic "mirror image of fraud" doctrine, where "the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other." *Skilling* at 400. Additionally, *Skilling* points to the fact that "[N]ondisclosure is outside the bounds of the fraud statutes." *Skilling* at 410. *Abdelaziz* also cites *Chiarella* that "silence without more" cannot be a crime.

The most famous recent case involving an "intentional" breach of contract and nondisclosure not being fraud in a contract setting is, of course, *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016), where the Second Circuit relied on not one but two cases from the First Circuit: *McEvoy Travel v. Heritage Travel*, 904 F.2d 786 (1st Cir. 1990), for the proposition that "the common law requires proof—other than the fact of breach—that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation." *Countrywide* at 658; *Sanchez v. Triple-S*, 492 F.3d 1 (1st Cir. 2007):

> A defendant's failure to disclose information, without more, cannot make out a violation of the Mail and Wire Fraud statutes. *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000)....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who—a jury might find—secretly harbored in his heart the hope that the buyer would never ask." *Countrywide* at 660, *quoting Sanchez* at 11.

Therefore, this Court's description of Petitioner's conduct fails to state a crime not only in the First Circuit, but apparently anywhere in America after the Second Circuit's decision in *Countrywide*, the Eleventh Circuit's decision in *United States v.*

*Takhalov*, 827 F.3d 1307 (11th Cir. 2016), or even the more famous decision from the Seventh Circuit in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016). Significantly, both *Countrywide* and *Weimert* involved contracts between sophisticated business people. To establish federal Mail and Wire Fraud, the government must also show that the defendant actually intended to cause economic harm to the other contracting party. *See United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017) *citing United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994). But once again, in this case, the government has made no such allegations. Critically, the Indictment makes no allegation that Petitioner failed to perform the work called for under the contract. Other than the breach of contract allegations, the Indictment makes absolutely no allegation of actual or intended economic harm to the Exchangors.

The Second Circuit's decision in *United States v. Countrywide*, 822 F.3d 650 (2d Cir. 2016) not only eviscerates the government's theory of culpability in Petitioner's case, it also nullifies the legal reasoning behind the jury instructions for Mail and Wire Fraud. The bedrock of these elements is the "scheme to defraud" which requires proof that the defendant had the knowledge that he was breaking the law and the criminal *mens rea* or specific intent in contemplating harm to the victim by making a misrepresentation of a material fact. *See Neder v. United States*, 527 U.S. 1, 25 (1999). Yet, the scope and interpretation of the term "scheme to defraud" has, according to the Second Circuit, bewildered the courts for decades. "The exact

contours of what kinds of conduct constitute a "scheme to defraud" have been the subject of some judicial discussion." *Countrywide* at 657. In *Countrywide*, everyone knew the mortgage brokers at Countrywide lied from the top executives on down, but no one was criminally indicted unlike in Petitioner's case. But, if a mortgage applicant lies about his wealth on a mortgage application for a cash mortgage that he defaults on after making only a few payments, then there is truly real "money or property" "obtained" from the bank by "trickery or deceit." Suffice it to say, if there was no criminal mail or wire fraud at Countrywide in 2008, there was no Mail and Wire Fraud at BPETCO in 1999.

The Second Circuit posited the central issue in *Countrywide* as what is fraud in a contract and illustrates the fundamental difference between a mere breach of contract as in Petitioner's case and a fraud: the intention of the breaching party to perform at the time of entering into the agreement, as opposed to a contracting party who never intended to perform at the outset (which is fraud). *Id*. at 656. The Second Circuit's observation that the issue is "novel" satisfies the requirement that a motion for a Writ of Audita Querela or Coram Nobis may be based on an intervening change in the law. The Second Circuit then embarked upon an analysis of the common law's treatment of fraud claims based upon breaches of contract, citing several famous First Circuit cases in its analysis of the history of Mail and Wire Fraud.

The Second Circuit then summarized its holding as follows: "a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution." Absent such proof, a subsequent breach of that promise - even where willful and intentional - cannot in itself transform the promise into a fraud:

> Accordingly, we deem the common law's contemporaneous fraudulent intent principle incorporated into the federal Mail and Wire Fraud statutes. Applying these principles to a fraud claim based on the breach of a contractual promise, we conclude that the proper time for identifying fraudulent intent is contemporaneous with the making of the promise, not when a victim relies on the promise or is injured by it. *Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation*. *Id*. at 662 (emphasis added).

Analyzing the history of the Mail and Wire Fraud statutes and citing *Durland v. United States*, 161 U.S. 306, 313 (1896), the Second Circuit buttressed its point: a "scheme to defraud" requires "intent and purpose." *Countrywide* at 662. Moreover, the scheme must be "designed to *induce* reliance on a known misrepresentation." *Id.* In other words, the proponent of the representation must know that they are lying or intentionally omitting necessary information. Accordingly, courts look to the individual's intent at the time the representation is made and not when the counterparty relied on or was injured by it. "Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation." *Id.*

The Second Circuit further emphasized that "regardless of how serious, intentional, or malicious the breach, *it is not fraudulent, absent that intention not to perform on the promise when it was made." Id.* at 661 (emphasis added). To hold to the contrary, the Court explained, would vitiate the common law's tolerance and encouragement of "efficient breaches." *Id.* In other words, common law gave parties to a contract two choices: either comply with the obligations of a contract or breach it and answer in damages. Therefore, the Second Circuit held that breaches of contract do not constitute a "scheme to defraud" under the Mail and Wire Fraud statutes, absent a fraudulent intent at the time the contract is made or later fraudulent misrepresentations. *Id.* at 661-62.

The Second Circuit, after reviewing the Supreme Court precedent contained in *Durland* and related cases, found that "[w]hat fraud in these instances turns on, however, is *when* the representations were made and the intent of the promisor *at that time*." *Countrywide* at 658. The Court also relied on and cited on more than one occasion the case of *McEvoy Travel*, for the proposition that "the common law requires proof-other than the fact of breach-that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation." *Countrywide* at 660.

Additionally, the District Court in December of 2005 did not have the benefit of *Abdelaziz* or several other recent cases from the First Circuit limiting the mail and

35

wire fraud statutes, requiring that the mailings and wires be in furtherance of the fraud. As sovereigns, states have "the prerogative to regulate the permissible scope of interactions between state officials and their constituents," and the Supreme Court has warned against interpreting federal laws "in a manner that ... involves the Federal Government in setting standards of good government for local and state officials." *See, e.g., United States v. Tavares*, 844 F.3d 46, 54 (1st Cir. 2016) (*quoting McDonnell v. United States*, 136 S.Ct. 2355, 2373 (2016)). In *Tavares*, the First Circuit reversed the RICO and mail fraud convictions and ordered the entry of judgments of acquittal, holding that while "[t]he 'in furtherance' requirement is to be broadly read and applied," *id.* at 58, the requirement "places an important limitation on federal authority." *Id.* (*citing Kann v. United States,* 323 U.S. 88 (1944)):

> Even assuming that there was a "scheme to defraud," the government did not present substantial evidence of a mailing "in furtherance of" such a scheme. *Hebshie* at 35-36. The government points to form rejection letters that OCP staff mailed to unsuccessful applicants, typically after the final candidates were selected, to satisfy the mailing requirement. The defendants contend that all letters were nevertheless mailed after the scheme reached its fruition. Regardless of the exact timing of the mailings, there is no evidence that the letters were material to the consummation of the defendants' scheme. *See Kann* at 94: "It was immaterial to [the defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this."). *Maze* at 405." *Tavares* at 59.

Because the federal mail and wire fraud statutes do not purport to reach all frauds, but only those "limited instances in which the use of the mails is a part of the

execution of the fraud, leaving *all other* cases to be dealt with by appropriate state law." *Kann* at 95 (emphasis added). *See also United States v. Maze*, 414 U.S. 395 (1974). In this case, the Indictment not only failed to address all five critical elements of mail and wire fraud, it appears that every single count in the Indictment relates to acts occurring after the alleged fraud had come to its full fruition. If the alleged fraud was a crime of omission in not telling the Exchangors that Petitioner was losing money or was trading in stock options, then none of the mailings and wires in this case satisfy the "in furtherance" requirement. None of them.

None of the wires were "steps in the plot" to mask or hide anything, and by the time the money was sent; the alleged fraud had been completed. The government's problem with Petitioner is that he engaged in allegedly "risky" option trading that was supposedly not disclosed to the Exchangors. Petitioner could have lost the money just as easily in auction rate municipal bonds as LandAmerica did, but a mere deprivation does not suffice for a mail fraud charge. As the Seventh Circuit stated in *Weimert* that "losses that occur even as the byproduct of a deceitful scheme do not satisfy the statutory requirement" of Mail and Wire Fraud. *See Weimert citing United States v. Walters*, 997 F.2d 1219, 1227 (7th Cir. 1993). Ultimately, to support its Mail and Wire Fraud charges, the government simply alleged an undisclosed investment risk and a breach of contract claim, which after *Skilling* is certainly not enough to allege a crime that supports jurisdiction of a federal court, much less a conviction.

Finally, in another post-trial landmark decision vacating a famous wire fraud conviction (see, e.g., the television show <u>American Greed),</u> the Eleventh Circuit gives a detailed historical analysis of the Mail and Wire Fraud statutes and adopts the Second Circuit's interpretation of what constitutes a "scheme to defraud" as opposed to a "scheme to deceive," so as to satisfy that requirement under the Federal Mail and Wire Fraud statutes. *See United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). To explain the difference between a "scheme to defraud" which is illegal under the wire fraud statute, and a "scheme to deceive" which may be morally wrong but is not conduct prohibited by the Mail and Wire Fraud statutes, the Eleventh Circuit uses what might be called the "Parable of the Deceitful Neighbor."

The Court considers two scenarios. In the first, a man calls his neighbor saying that his child is very ill, and the neighbor responds by rushing over to see if she can help. The man asks her to give him change for a dollar, which the helpful neighbor gladly gives him. She later learns that the neighbor's child was not sick at all. The second scenario is identical to the first, except that now the Deceitful Neighbor gives the woman a counterfeit dollar in exchange for the four quarters. The Eleventh Circuit explains that the first scenario is not wire fraud, but the second one is, despite the fact that the woman would not have rushed over in the first scenario had she known that the child was not really sick.

The First Circuit came to the same conclusion in both *Tavares* and *Berroa*. In *Tavares*, the mails were used to send out letters to the people who were not chosen for the jobs so that it was not in furtherance of any fraud. Similarly, in *Berroa*, the First Circuit concluded that all the doctors had lied on their applications, but that not all lies and deceptions can be prosecuted for mail and wire fraud in stating that "under the government's theory, any false statement in an application...could constitute a federal crime." To prosecute Mail and Wire Fraud cases arising out of contractual relationships, "much more" than a mere undisclosed breach is required. *See Triple-S* at 11. At a minimum, fraud "requires a showing of deception *at the time the promise is made*." *Id*. (emphasis added). In this case, the government has made no such allegation. In fact, to the contrary, the language of the indictment suggests that the alleged breach and deceptions did not take place until at least the end of 2000, more than two years into the engagement of 126 contracts, of which 119 were successfully completed. How many "fraudulent" businesses have a 95% successful completion rate? There was no fraudulent scheme here and there certainly was no criminal *mens rea* or fraudulent intent.

Moreover, at this late date, the government has not provided even one example of Petitioner making an oral or written fraudulent misrepresentation, much less a fraudulent *material* misrepresentation as required by *Neder*, or an outright fraudulent misrepresentation (as opposed to nondisclosure) as required by *Skilling*. Since these

crucial elements were missing from both the indictments and Petitioner's two trials, Petitioner's conviction must be set aside and indictments dismissed based on the First Circuit's decision in *Bravo-Fernandez* in 2019:

> Among the elements of §666, the government was required to establish that the entity Martínez represented as an agent, in this case the Commonwealth of Puerto Rico, received at least $10,000 in federal "benefits" within the meaning of that statute. The government did not meet this burden. Accordingly, we must reverse defendants' convictions for federal program bribery. . . . For the reasons explained above, we conclude that the government failed to establish an essential element of the crime it charged defendants with. We need not go further and hereby reverse Bravo's and Martínez's §666 convictions. We direct the district court to enter a judgment of acquittal on both charges. *Bravo-Fernandez* at 244, 250-51.

## VI.     VENUE WAS IMPROPER IN THE DISTRICT OF MASSACHUSETTS

Just as with Jurisdiction, Venue was clearly not proper in this case, and this constitutes Plain Error. A defendant in a criminal case has a constitutional right to be tried in a proper venue. *United States v. Johnson,* 323 U.S. 273, 275 (1944) (noting that two constitutional provisions, Article III, §2, cl. 3 and the Sixth Amendment both provide a right to trial in the state where the crime is committed); *United States v. Uribe*, 890 F.2d 554, 558 (1st Cir. 1989); *see also* Fed. R. Crim. P. 18. The government bears the burden of proof on the issue of venue. *United States v. Lanoue*, 137 F.3d 656, 661 (1st Cir. 1998). "[I]t is readily apparent that venue requirements promote both fairness and public confidence in the criminal justice

system." *Johnson* at 276. Venue must be determined by the nature of the crime alleged, **by analyzing the actual conduct of the defendant constituting the offense and the location of the criminal acts**. *United States v. Scott,* 270 F.3d 30, 35 (1st Cir. 2001). More than a *de minimis* connection to the district is required. *Uribe* at 559. *See United States v. Anderson*, 328 U.S. 699, 703 (1946) "[t]he locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it." These congressional and constitutional protections are meant to provide "**a safety net, which ensures that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum** solely at the prosecutor's whim." *United States v. Salinas*, 373 F.3d 161, 164 (1st Cir. 2004). Moreover, after *Skilling*, the nondisclosure of option trading could not possibly be the alleged crime that established proper venue, because none of that happened in Massachusetts.

As the District Court stated in its decision from Petitioner's first trial: "Petitioner has persistently maintained an objection to venue in this District." *United States v. Carpenter*, 405 F.Supp.2d 85, 88 (D.Mass. 2005). It is guaranteed by the Constitution that a criminal defendant has the right to be tried in an appropriate venue. The importance of this right to the Founders is emphasized by the fact that it is mentioned in the Declaration of Independence as a complaint and not once, but twice, in the text of the Constitution. *See* U.S. Const. art. III, §2, cl. 3 ("The Trial of all Crimes ... shall be held in the State where the said Crimes shall have been committed

...."); *id.* amend. VI (requiring trial of a criminal case "by an impartial jury of the State and district wherein the crime shall have been committed"). Congress has further entrenched these norms by an explicit directive that limits a criminal prosecution to "a district in which the offense was committed." Fed.R.Crim.P. 18. This rule "echoes the constitutional commands." *United States v. Cabrales,* 524 U.S. 1, 6 (1998). Under *Salinas,* the result is meant to be a safety net for the defendant, ensuring that a criminal defendant cannot be tried in a distant, remote, or unfriendly forum as has happened to Petitioner not once, but twice. As Judge Lipez recently articulated in his dissent in *United States v. Seward*, 967 F.3d 57 (1st Cir. 2020), **it is solely the actions of the Defendant himself** that establishes proper venue for a criminal prosecution:

> "I agree with my colleagues on the legal framework for our venue analysis. As acknowledged by the majority, and reaffirmed repeatedly by the Supreme Court, "*the locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *Anderson* at 703; *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999); *Cabrales* at 6-7. We part ways, however, on the application of this principle to 18 U.S.C. §2250. In my view, based on a close examination of the text and structure of the statute, its placement in a comprehensive legislative scheme, and the Supreme Court's precedents, the interstate-travel element is not part of the nature of the crime. **Rather, the nature of the crime defined by §2250 is the failure to register or update a registration, such that venue is proper only where that failure occurs. Accordingly, I would vacate Seward's conviction and hold that venue for prosecuting Seward was not proper in Massachusetts**." *Id.* at 68 (emphasis added).

In Petitioner's case, Venue in the District of Massachusetts was clearly improper as Petitioner never was a resident of Massachusetts, nor did he have

anything to do with Massachusetts until the court proceedings in this case began, and

the government alleged no overt acts by Petitioner with any connection to the State

of Massachusetts in the Indictment. Because it is indisputable that he did not perform

any "essential conduct element" of the crime charged and alleged in the Indictment

in the district of Massachusetts, his conviction must be vacated. *See, e.g., United*

*States v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014). As explained by the Third Circuit

in *Auernheimer* (citing the First Circuit in *Salinas*), these constitutional provisions

manifest a strong constitutional policy disfavoring trials removed from the situs of

the Defendant's alleged criminal activity. As explained by the Third Circuit:

> The Supreme Court has repeatedly made clear that the constitutional limitations on venue are extraordinarily important. "[Q]uestions of venue are more than matters of mere procedure. They raise deep issues of public policy in the light of which legislation must be construed." *Travis v. United States,* 364 U.S. 631, 634 (1961). "The provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores,* 356 U.S. 405, 407 (1958); *accord United States v. Passodelis,* 615 F.2d 975, 977 (3d Cir. 1980). The founders were so concerned with the location of a criminal trial that they placed the venue requirement, which is "principally a protection for the defendant," *Cabrales* at 9, in the Constitution in two places. *See* U.S. Const. art. III, § 2, cl. 3 and amend. VI. They did so for good reason. A defendant who has been convicted "in a distant, remote, or unfriendly forum solely at the prosecutor's whim," *Salinas* at 164, has had his substantial rights compromised. *See Auernheimer* at 540, *citing Salinas* at 162, 164.

Moreover, in a criminal case, "venue must be narrowly construed." *United*

*States v. Jefferson*, 674 F.3d 332, 365 (4th Cir. 2012). Additionally, "Venue...is an

element...which must be proved...by a preponderance of the evidence." *Auernheimer*

*citing Salinas* at 163. All of the counts in the Indictment in this case lacked proper venue because **zero** evidence whatsoever was adduced at trial showing Petitioner inducing any of the Exchangors to work with Paley or BPETCO, or showing any conduct of Petitioner's that actually "caused" the mailings or wires, and it is clear that all of these mailings and wires were non-fraudulent and not "in furtherance of any scheme" to defraud. *See Tavares* at 58. Furthermore, after *Skilling*, "Nondisclosure is outside the bounds of the fraud statutes." *Skilling at* 410. Therefore, there was **zero** evidence whatsoever of any mailings or wires in furtherance of any scheme to defraud that properly established Venue in the District of Massachusetts. *See Salinas* at 164.

Under the standard set in *Cabrales*, *Salinas*, and *Auernheimer*, Petitioner committed no "essential" act in Massachusetts, so it is clear that he committed no triable crime in a Massachusetts court. If "non-disclosure" of option trading was the alleged crime, that conduct or lack of conduct happened in Connecticut. If trading options or losing money was the "crime," then that happened in the Southern District of New York. As with a lack of subject matter jurisdiction, this is not "harmless error," and therefore improper venue requires dismissal of the indictment and setting aside of the Judgment in this case. *See, e.g., United States v. Strain*, 396 F.3d 689 (5th Cir. 2005) (remanding for entry of judgment of acquittal due to the government's failure to prove venue and stating that such failure "does not entitle the government to a

second chance at prosecution."). Not only must the government prove venue by a preponderance of the evidence at trial, *see Salinas* at 163, but it must also allege sufficient facts in the Indictment to establish proper venue *ab initio*. This the government did not do. Therefore, because Petitioner did not raise this issue on appeal, he realizes that he must satisfy the Plain Error standard of *Rosales-Mireles,* which he clearly does because improper Venue can never be harmless error. *See Auernheimer* at 540.

The alleged facts in this matter are very similar to the facts presented in *Salinas*, in that any alleged conduct or omissions by Petitioner occurred outside of Massachusetts. In *Salinas,* the defendant was prosecuted for passport fraud in New Hampshire where the fraud was discovered by the Passport Office, rather than in New York, where the defendant applied for the passport. The Court dismissed the indictment for lack of venue finding that all of the criminal conduct - the elements of the offense - occurred in New York. *Id.* at 165-70. Similarly, in this case, there was simply no justification for laying venue in Massachusetts as all of the alleged conduct by Petitioner occurred in Connecticut or New York. Rightly or wrongly, anything that he did or did not do, he did only in Connecticut or New York, and the Indictment does not contradict these facts. If the Court replaced Petitioner's name with "*Salinas*" and "Passport" with "Option Trading," then Petitioner is entitled to

the same treatment as the defendant in *Salinas*. Finally, this is what the Supreme

Court had to say about the history of the Vicinage Clause in *Smith*:

> There is no question that the founding generation enthusiastically embraced the vicinage right and wielded it "as a political argument of the Revolution." Prior to the Revolution, Parliament enacted measures to circumvent local trials before colonial juries, most notably by authorizing trials in England for both British soldiers charged with murdering colonists and colonists accused of treason. The Continental Congress and colonial legislatures forcefully objected to trials in England before loyalist juries, characterizing the practice as an affront to the existing "common law of England, and more especially to the great and inestimable privilege of being tried by ... peers of the vicinage." The Declaration of Independence also denounced these laws, under which, it said, British soldiers were "protect[ed] ... by a mock Trial" and colonists were "transport[ed] ... beyond the Seas to be tried for pretended offences." As States declared independence, most incorporated some form of a venue or vicinage clause in their governing documents, but none of these provisions specified a particular remedy for violations. The common-law vicinage right, both as a jury requirement and as a proxy for venue, remained prominent during debates over the ratification of the Constitution. As originally proposed, the Constitution contained only the Venue Clause, which, as noted, says nothing about jury composition. Appealing to "ancient common law," Anti-Federalists objected to this omission. Federalists responded that Congress could secure the vicinage right by statute, analogizing to common law, where "the preservation of this right [was] in the hands of Parliament." After the ratification of the Constitution, Congress yielded in part to the Anti-Federalists' argument and included a vicinage right in the Sixth Amendment. James Madison's initial draft of the Amendment required a jury "of the vicinage," 1 Annals of Cong. 435 (1789), **but Congress amended that language so that it guaranteed a jury from the State of the crime and from any smaller judicial districts that Congress chose to create.** This history tells us two important things about the way in which the Constitution dealt with the common-law vicinage right. First, the right was highly prized by the founding generation, and this right undoubtedly inspired the Venue and Vicinage Clauses. Second, although the Clauses depart in some respects from the common law—most notably by providing new specifications about the place where a crime may be tried—there is no meaningful evidence that the Constitution altered the remedy prescribed by common law for violations of the vicinage right.

*Smith v. United States*, 143 S. Ct. 1594, 1604–06, (2023).

## VII.   THE INDICTMENT WAS UNTIMELY AND DID NOT PROVIDE CONSTITUTIONAL FAIR WARNING

The Supreme Court's decisions in *Kokesh v. S.E.C.,* 137 S.Ct. 1635 (2017) and *Gabelli v. S.E.C.,* 568 U.S. 442 (2014) are dispositive of this case because any fraudulent BPETCO contracts were drafted by Martin Paley in 1997 or 1998 at the latest. In *Kokesh*, Justice Sotomayor wrote for a unanimous Supreme Court, where it was determined that §2462 established a 5-year limitations period for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture." *See Kokesh* at 1638, *quoting Gabelli* at 454. In fact, Chief Justice Roberts further explained the absolute nature of the Statute of Limitations in criminal cases for any type of criminal penalties as follows: "[T]he Statute of Limitations, the five-year clock for 28 U.S.C. §2462, begins to tick when a defendant's allegedly fraudulent conduct occurs." *Gabelli* at 448.

Since Petitioner's allegedly fraudulent conduct could only be in 1998 when Petitioner met Mr. Paley who drafted the Exchangor Agreements, the September 2004 Indictment was barred by the Statute of Limitations. *See* 18 U.S.C. §3582. The Supreme Court's decisions in *Gabelli* and *Kokesh* explained the absolute nature of the Statute of Limitations in criminal cases for any type of criminal penalties and are dispositive of this case. Chief Justice Roberts went on to say in *Gabelli*: "Statutes of

limitations set a fixed date when exposure to the specified Government enforcement efforts end." Such limits are "vital to the welfare of society" and rest on the principle that "even wrongdoers are entitled to assume that their sins may be forgotten." *Gabelli* at 448-49, *citing Wilson v. Garcia*, 471 U.S. 261, 271 (1985).

Clearly, if Petitioner had "Fair Warning" that he faced three years in prison and forfeitures of $14 million just from losing money in the stock market, there is no question that he would never have involved himself with Marty Paley or Merrill Lynch in the BPETCO debacle. Moreover, the Government has never answered the simple question as to what could have Petitioner invested in, lost all of the investor funds like in the *LandAmerica* case, or the *OptionsSellers.com* case, and yet not have been indicted? Therefore, Petitioner is in this predicament not because of his own conduct or omissions, but rather because the indictments of 2004 failed to state a crime under federal law or give Petitioner the "Fair Warning" as required by the Supreme Court in *Marinello* and several other cases since Petitioner's second trial in 2008. The Supreme Court made clear the concept of "Fair Warning" is a fundamental protection for all defendants accused of a crime. The Supreme Court's decision in *Marinello v. United States*, 138 S.Ct. 1101 (2018) provides that a defendant must know that what he is doing is crossing a line into "illegal conduct," as well as the **punishment he will receive** if that bright line is passed:

> "We wrote that we have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of

Congress and out of concern that a fair warning should be given to the world in language that the common world will understand, ***of what the law intends to do if a certain line is passed.*** *McBoyle v. United States*, 283 U.S. 25, 27 (1931)." *Marinello* at 1106 (emphasis added).

The use of Justice Oliver Wendell Holmes' description of knowing what Society will do to you when the "bright line" of the law is crossed is particularly appropriate for this case where 20 years later, Petitioner is still making the case that what he did was not criminal at all. For example, the defendant in *McBoyle* literally stole an airplane but was charged under the Automobile Act as if he had stolen a car. In this case, Petitioner was accused of Mail and Wire Fraud for losing $8 million of client funds during the NASDAQ Stock Market Crash of 2000, but at this late date there is not a single exhibit showing that Petitioner lied to anyone about anything at any time or had the evil intent to steal anyone's money, harm anyone, or that he *caused* any mailing or wire *in furtherance* of any fraud. So, whereas the defendant in *McBoyle* really did steal a plane and the defendant in *Marinello* really did commit tax evasion, Petitioner did not do any act that he was accused of, nor could he reasonably believe that any of his conduct was criminal or would put him in prison for three years. All of these "Fair Warning" cases happened after Petitioner's second trial 2008, and none of these "Fair Warning" issues were raised by Petitioner's attorneys on appeal.

Similarly, the defendants in *Rosa-Ortiz* and *Peter* (not to mention the defendant in *United States v. Guzman-Merced,* 2020 WL 7585176 (1st Cir. 2020) (from

December 2020) actually did the act they pleaded guilty to, but it turned out not to be a federal crime and their convictions were vacated. Now, with *Marinello*, it is "Constitutionally" clear that not only do you need to know you are breaking the law, you must also know that you will be punished for your conduct, and you must also know the penalty for breaking the law as well. Perhaps the best analogy the Supreme Court uses in *Marinello* is that every American couple pays their babysitter in cash. Neither the parents nor the babysitter report that to the IRS as taxable income. Clearly, that could be considered a violation of the tax laws, but no one would seriously believe the babysitter would be sentenced to 36 months for accepting cash "under the table" for doing her job. Similarly, no one could expect that Petitioner could possibly expect that he would be sentenced to 36 months for losing money in the stock market, especially when one considers that had PaineWebber not stripped the accounts, Petitioner could have been up $15 million in January of 2001 rather than being down $9 million in December of 2000 after the contested election of November 2000.

Once again, Petitioner is a much better example than *Peter, Rosa-Ortiz, Marinello,* and *Guzman-Merced* combined. As the Supreme Court teaches us in *Morissette v. United States*, 342 U.S. 246 (1952), for there to be a crime, an evil act must be concurrent with an evil mind. "Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand," quoting Justice Holmes' famous observation that "[e]ven a dog distinguishes

between being stumbled over and being kicked." *Id.* at 251-52. In *Elonis v. United States,* 135 S.Ct. 2001 (2015), Chief Justice Roberts confirmed that the cornerstone of American Jurisprudence is that a person should not be deemed criminally responsible for mere negligence. Chief Justice Roberts further stated that the government must allege and prove that the person had the necessary criminal intent or criminal *mens rea* before conduct could be considered criminal, and that this principle of criminal justice in America is "as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. *Morissette* at 250." Similarly, as was stated by Justice Gorsuch in *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011):

> "[t]he contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. *Morissette* at 250. The simple fact is intent and knowledge are different things, different as a matter of their plain meaning, different in their treatment in modern American criminal law. And the sentencing commission chose here to invoke the former term, not the latter. The guidelines' definition of "intended loss" makes no mention of knowledge or some lesser *mens rea* standard." *Manatau* at 1051.

Also, in *United States* v. *United States Gypsum,* 438 U.S. 422 (1978), the clear-cut requirement of *mens rea* for a crime is firmly embedded in the American System of Justice. As the Supreme Court has observed, "[t]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of American criminal

51

jurisprudence." *Id.* at 436. "Thus, to meet the statute's *mens rea* requirement, a defendant must consciously behave in a way the statute prohibits." *Id.* at 445. Therefore, something more is required than the doing of the act proscribed by the statute. *United States v. Balint*, 258 U.S. 250 (1922).

In *Liparota v. United States*, 471 U.S. 419 (1985), the Supreme Court "rejected that interpretation of the statute, because it would have criminalized a broad range of apparently innocent conduct and swept in individuals who had no knowledge of the facts that made their conduct blameworthy." *Elonis* at 2010, *citing Liparota* at 426. Petitioner never received the "fair warning" that the Supreme Court said was "essential" in *Marinello*, and that before someone can be prosecuted, they must know they are breaking the law and crossing that "bright line" as stated in *Arthur Andersen v. United States*, 544 U.S. 696 (2005):

> "Fair warning should be...in language the common world will understand, of what the law intends to do if a certain line is passed. *McBoyle* at 27."

Clearly this Court must realize that there was no intended crime here based on *Abdelaziz*, no criminal *mens rea* based on Justice Breyer's Opinion in *Xiulu Ruan*, and absolutely no criminal scienter. This Court knows better than anyone that Petitioner never intended to defraud the Exchangors and that the Exchangors have been paid back almost $50 million in Petitioner's legal victories over PaineWebber and Merrill Lynch on their $8 million losses in the stock market crash of 2000. **Even the District Court noted that: "He always intended to pay the money back."** Furthermore,

Petitioner did not *cause* any of the mailings or wires in this case, and none of the mailings or wires were done in the furtherance of any fraud as required by *Tavares*, because there was no scheme to defraud based on *Skilling*. Petitioner's conviction should therefore be set aside because there were no facts alleged in the indictment or proven at trial that showed the "concurrence of an evil-meaning mind at the same time an evil act is committed" to be considered.

## VIII.  THE DUE PROCESS VIOLATIONS IN THIS CASE ARE EXTRAORDINARY

*All* of the errors in this case are constitutional and structural errors and clearly amount to one large Due Process Clause violation, requiring the vacating of Petitioner's conviction. Despite pointing out Levine's obvious and persistent perjury, and the Government's failure to correct any of those lies *in front of the jury* as is their duty, the error here was considered "harmless" because Petitioner's attorney did such a "great job" on the cross-examination that the jury must have known Levine was lying:

> Carpenter consequently was able to and did cross-examine the lying witness "vigorously." The district court therefore determined that a mistrial was not warranted on this basis. On appeal, Carpenter has not identified any reasonable likelihood that the jury's verdict in this case was impacted by the false testimony in light of his vigorous cross-examination. That ends this attack. *United States v. Carpenter*, 736 F.3d 619, 631 (1st Cir. 2013).

However, that is not the correct legal standard for an error under *Brady-Giglio-Napue* in this Circuit or anywhere else, and a "vigorous" cross-examination is not a

substitute for truthful testimony and certainly is not the remedy required by the Supreme Court in *Napue* and *Giglio*. Nor does a "vigorous" cross-examination alleviate the Government's burden, obligation, and legal duty to bring to the jury's attention that their witness, Levine, lied. Respectfully, this Court should vacate Petitioner's conviction pursuant to 18 U.S.C. § 2106 because "Levine's testimony [as well as eight other brokers and managers from Merrill Lynch] was perjurious in this Court's judgment, *and the Government knew it*." *See United States v. Carpenter*, 808 F.Supp.2d 366, 389 n.5 (D.Mass. 2011), Doc. 377 (emphasis in original). It has long been established by the First Circuit that they will not allow the use of perjured testimony or knowingly-false evidence to be used by the government to convict someone. *See, e.g., Drumgold v. Callahan*, 707 F.3d 28 (1st Cir. 2013):

> ("[D]ue process cannot be deemed to be satisfied if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured."); *Pyle* at 215-16 ("Petitioner's papers are inexpertly drawn, but they do set forth allegations that his imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him."); *Napue* at 269 (recognizing "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction"); *Limone* at 45 ("[T]hose charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit."); *Haley* at 49 ("Deliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights."). *Brady* at 87 (specifying that the due process right applies "irrespective of the good faith or bad faith of the prosecution"). *Drumgold* at 61.

It is also the established law of the United States that a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution. *See, e.g.*, *Mooney v. Holohan*, 55 S.Ct. 340 (1935). As the Supreme Court stated in its unanimous decision in *Giglio*: "It has long been established that the prosecutor's deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States,* 405 U.S. 150, 153 (1972). *See, also*, *Banks v. Dretke*, 540 U.S. 668 (2004): "A conviction based on testimony known by the prosecutor to be perjurious is a denial of due process." The First Circuit has also made it clear that the knowing use of perjured testimony is also considered to be a serious *Brady* violation, and requires the order of a new trial. See *United States v. Gonzalez-Gonzalez*, 258 F.3d 16, 21 (1st Cir. 2001), *citing Strickler v. Green*, 527 U.S. 263, 280-81 (1999).

In *Drumgold*, the First Circuit described *Mooney*'s core premise as "well-settled" in the First Circuit citing to *Coggins v. O'Brien*, 188 F.2d 130, 138 (1st Cir. 1951) and the Supreme Court's unanimous decision in *Napue v. Illinois*, 360 U.S. 264, 269 (1959) that was also cited by the Supreme Court's unanimous decision in *Giglio*. The First Circuit goes on in citing *Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004), *citing Miller v. Pate*, 386 U.S. 1 (1967): "In 1967, the very year the crimes took place, Justice Stewart, writing for a unanimous court stated More than 30 years ago this Court held that the Fourteenth Amendment cannot tolerate a state criminal

conviction obtained by the knowing use of false evidence. There has been no deviation from that established principle." *Miller* at 7. *See, also, Ouimette v. Moran*, 942 F.2d 1 (1st Cir. 1991), where the First Circuit vacated defendant's conviction because the government withheld evidence of defendant's partner's criminal background).

Judge Roach, in her 2016 Opinion, also refers to Merrill's general counsel Bevilacqua, as well as other Merrill executives' testimony that it was clear to them that a number of people at Merrill had been lying for many years, participating in the Snyder and Bingham lies and cover-up of lies, as well as the destruction and spoliation of evidence. As the Supreme Court has described, the government's conduct in this case clearly warranted a new trial as the case was "infested with constitutional errors." *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995). *See, also, Wearry v. Cain*, 136 S.Ct. 1002 (2016), where only **one** *Brady* violation took a convict off of death row and required a new trial:

> "[T]he suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* at 87. *See also Giglio* (clarifying that the rule stated in *Brady* applies to evidence **undermining witness credibility**). "Evidence qualifies as material when there is "**any reasonable likelihood**" it could have affected the verdict. *Giglio* at 150 (*quoting Napue* at 271). To prevail on his *Brady* claim, Wearry need not show that he "more likely than not" would have been acquitted had the new evidence been admitted. *Smith v. Cain*, 132 S.Ct. 627, 629-31 (2012). He must show only that the new evidence is sufficient to "**undermine confidence**" in the verdict. *Ibid.*" *Wearry* at 1006 (emphasis added).

Now Petitioner seeks the delayed justice of having his conviction set aside through 18 U.S.C. § 2106, and having his indictment dismissed, and his good name restored based on the Government's egregious violations of his constitutional rights in the knowing use of evidence they knew to be false and outright perjury that they heard twice in two trials in 2005 and 2008. Sad, but true, if Petitioner had Judge Roach's Opinion in February of 2014 at sentencing instead of May 2016 (See Doc. 545), Petitioner's life would have been totally different. Clearly Judge Roach's Opinion shows that Attorney Snyder coached the Merrill witnesses to lie, and because of their repeated lies in the civil forum, they had to continue repeating those lies in Petitioner's criminal trials in 2005 and 2008, and the Government worked in concert with Attorney Snyder to suborn knowing perjury in both of his trials as well as the civil litigation with the Exchangors after 2008.

Attorney Snyder also knew about the February 2008 *Iantosca* lawsuit, the SEC investigations, the NASD investigations, the Malia file, and the David Patterson information that came out when Dickstein Shapiro took over in 2009. Snyder as counsel for Merrill Lynch, and separate counsel for the Exchangors, sat directly behind the prosecution at both of Petitioner's trials, and unbelievably did not mention any of this information to the prosecution, including the newly-discovered *Iantosca* lawsuit against Merrill Lynch of February 2008 which Petitioner did not even hear about until April of 2009. Perhaps the prosecution did not think that they

had a duty under *Brady* and *Jencks* to share this exculpatory information with Petitioner. Clearly the Supreme Court disagrees with that decision, based on its recent decision in *Turner v. United States*, 137 S.Ct. 1885 (2017):

> The Government does not contest petitioners' claim that the withheld evidence was "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler* at 281-82. Neither does the Government contest petitioners' claim that it "suppressed" the evidence, "either willfully or inadvertently." *Id.* at 282. It does, as it must, concede that the *Brady* rules "overriding concern [is] with the justice of the finding of guilt," *United States* v. *Bagley*, 473 U.S. 667, 678 (1985) (quoting *United States* v. *Agurs*, 427 U.S. 97, 112 (1976)), and that the Government's "interest...in a criminal prosecution is not that it shall win a case, but that justice shall be done," *Kyles* v. *Whitley*, 514 U.S. 419, 439 (1995) (quoting *Berger* v. *United States*, 295 U.S. 78, 88 (1935)). Consistent with these principles, the Government assured the Court at oral argument that subsequent to petitioners' trial, it has adopted a "**generous policy of discovery**" in criminal cases under which it discloses any "information that a defendant might wish to use." As we have recognized, and as the Government agrees, *id.*, "[t]his is as it should be." *Kyles* at 439 (explaining that a "prudent prosecutor['s]" better course is to take care to disclose any evidence favorable to the defendant (quoting *Agurs* at 108)). *Turner* at 1893, *citing Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (emphasis added).

Assuming, *arguendo*, that even if Attorney Snyder purposefully hid all of the Merrill lies from the Government, his knowledge is still imputed to the Government because Snyder was there for each and every 302 Report used against Petitioner in his Grand Jury hearing and sat behind the Government every day of his 2008 trial. Moreover, the knowledge of the SEC and NASD investigations of Merrill concerning BPETCO are clearly *Brady* materials attributable to the Government that should have been turned over to the defense, but were not. This failure alone of the

Government to turn over vital material information warranted a new trial in 2013 and now warrants the vacating of Petitioner's conviction by ordering Judge O'Toole to grant the Writ of Coram Nobis that the Government did not even oppose.

The simple fact that Judge Roach's 2016 opinion mentions several SEC investigations that Petitioner must have passed and the Government did not turn over that *Brady-Giglio-Jencks* evidence, demands that this Court vacate Petitioner's conviction pursuant to the Supreme Court's decision in *Turner* at 1893, *citing Cone* at 469-70 and this Court's decision in *Ouimette* and *Bravo-Fernandez*. See, once again, the quote from *Turner* above. Just as important to Petitioner is the fact that the Court knows there was only one witness at Petitioner's Grand Jury, and that was an FBI Agent who just repeated all of the lies that were told to him by the brokers at Merrill Lynch. This, too, is a separate reason set aside Petitioner's conviction.

There is no other case in any circuit in this Country that can match the Due Process delays in this case. Petitioner asks this Court to focus on the extraordinary Due Process delays in this case pursuant to the *Barker* factors as suggested by Justice Sotomayor in her concurrence in *Betterman v. Montana*, 136 S.Ct. 1609 (2016). Viewing Petitioner's now 24 year-long "Kafkaesque" odyssey with the vision provided by *Betterman*, his preindictment delay of four years was longer than the delay in *Marion*, the inexplicable delay from June 2008 to September 2011 was longer than the delay in *Moore*, and now his total Due Process delay is more than

double the seven-year delays of *United States v. Loud Hawk*, 474 U.S. 302 (1986) and *Doggett*. Now that the Supreme Court has clearly laid out the rules of Due Process in *Betterman*, this Court cannot again ignore the clear violation of Petitioner's Constitutional rights.

Petitioner respectfully asserts that there was no fraud in this case as a matter of law based on *Chiarella* and *Skilling* as cited in *Abdelaziz*, nor did he have the "Fair Warning" in his indictment that is the cornerstone of American jurisprudence. But even assuming, *arguendo*, that Petitioner did something wrong or illegal, he certainly did not receive a fair trial in either of his two trials in 2005 and 2008. Because of the pre-indictment delay between January of 2001 and September of 2004, and the post-trial Due Process delay between sentencing of almost six years and the total Due Process delay of 15 years, it is Petitioner who should have the landmark case for both violations of the Due Process Clause under *United States v. Lovasco*, 431 U.S. 782 (1977) and *United States v. Marion*, 404 U.S. 307 (1971). In fact, it is significant that the delay of 39 months from Petitioner's trial in 2008 through September 2011 - when this Court granted Petitioner's second new trial order - was longer than the delay for convicted murderer Rocky Moore. *See, e.g., Moore v. Arizona*, 414 U.S. 25 (1973):

> Moreover, prejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. Inordinate delay, "wholly aside from possible prejudice to a defense on the merits, may `seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create

anxiety in him, his family and his friends.' These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty." *Moore* at 27, *citing Marion* at 320-21.

The delay in this case also exceeds that of *United States v. Handa,* 892 F.3d 95 (1st Cir. 2018) and *United States v. Irizarry-Colon,* 848 F.3d 61 (1st Cir. 2017) combined, so that Petitioner's conviction and indictment should be vacated. Ironically, those two seminal cases in the First Circuit both cite Petitioner's case. *See Handa* at 101, *citing United States v. Carpenter*, 781 F.3d 599, 610 (1st Cir. 2015) ("[d]elay of around one year is considered presumptively prejudicial, and the presumption that delay prejudices the defendant intensifies over time."), and *Irizarry-Colon* at 68 (same). The Speedy Trial violations in this case are also not a close call as there was no reason for the delay from June 2008 to May 2015, nor was there any balancing tests done in the interests of justice. *See United States v. Zedner*, 547 U.S. 489, 507 (2006).

Moreover, the *Barker* factors that Justice Sotomayor stated in *Betterman*, and the seven-year delay between Petitioner's second trial in June 2008 and the First Circuit's decision in May 2015 (ignoring fundamental legal principles of not only the First Circuit but the Supreme Court as well), mandates that Petitioner's indictment and conviction be vacated. There were no reasons placed on the docket as required by §3161(h)(7) and the Supreme Court's decision in *Bloate v. United States*, 559 U.S.

196 (2010). Thus, the extraordinary delay in Petitioner's case is far longer than any delay in *United States v. Dezeler*, 81 F.3d 86 (8th Cir. 1996) (delay of only one day); *United States v. Huete-Sandoval*, 668 F.3d 1 (1st Cir. 2011) (delay of only 16 days), and *Bloate* and *United States v. Tinklenberg*, 131 S.Ct. 2007 (2011) (delays of only 9 days). As the Supreme Court has explained, "The relevant provisions of the Act are unequivocal," and "[t]he sanction for a violation of the Act is dismissal." *Zedner* at 507, 509. If "the trial does not begin on time, the indictment or information must be dismissed." *Id*. at 508. At this point, all of the Exchangors have been paid back many times their original losses, almost $50 million on an $8 million loss in the great NASDAQ stock market crash of 20 years ago.

Petitioner hereby requests that this Honorable Court do the same calculation that was done for *Irizarry-Colon* and arrive at the same conclusion thereby setting aside Petitioner's conviction and dismissing his indictment with prejudice for violations of the Speedy Trial clause. Unlike the defendant in *Handa*, Petitioner has lived in the same house in Connecticut and has been under Government investigation or supervision for the past 24 years since he lost the Exchangors' money in the NASDAQ Stock Market Crash of 2000. Petitioner would also like to emphasize the Third Circuit opinion in *United States v. Velazquez*, 749 F.3d 161 (3d Cir. 2014) written by Judge Lipez of First Circuit fame, where he reviews the six-year delay in bringing Mr. Velazque*z,* a notorious drug dealer and dangerous criminal, to trial. Mr.

Velazquez was either evading justice (the government's view) or was just a transient individual (Third Circuit's view) when he was arrested in California and shipped back to Philadelphia on an old arrest warrant. Meanwhile, Petitioner was dutifully checking in with pre-trial services for the 14 years leading up to his sentencing, including the five-year delay from 2008 until his new trial order was overturned in 2013.

Mr. Velazquez pled guilty while preserving his Speedy Trial claim and was sentenced to 87 months. In vacating his conviction and sentence for violations of the Speedy Trial Clause, Judge Lipez discussed the second of the *Barker* factors: who is responsible for the delay, which is the "flag that all litigants seek to capture," *Loud Hawk* at 315. Judge Lipez refers to *Doggett,* which describes the range of the government effort to pursue an accused as extending from "reasonable diligence" to "bad-faith" delay. *Doggett* at 656. In the next paragraph, Judge Lipez writes:

> "Negligence over a sufficiently long period can establish a general presumption that the defendant's ability to present a defense is impaired, meaning that a defendant can prevail on his claim despite not having shown specific prejudice. *See Doggett* at 658 (finding a Speedy Trial violation based on general prejudice where government's negligence led to six-year delay). This general presumption applies because "impairment of one's defense is the most difficult form of Speedy Trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown." *Id.* at 655 (*quoting Barker* at 532). "Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Doggett* at 655.

In other words, **Judge Lipez describes exactly what happened in this case**; the theory of "presumptive prejudice" because of the extended delay of over three years. "[T]o trigger a Speedy Trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from `presumptively prejudicial' delay." *Doggett* at 651-52. Delays exceeding one year are generally found to be "presumptively prejudicial." *Doggett* at 652 n.1. If, after the threshold inquiry is satisfied and the second and third factor are considered, all three of these factors weigh heavily against the government, the defendant need not show actual prejudice (the fourth factor) to succeed in showing a violation of his right to a Speedy Trial. *Doggett* at 647.

Petitioner's conviction, unlike anyone else, was dismissed three years after his trial. But, the Government decided to violate the double jeopardy clause of 18 U.S.C. §3731 that prevents the government from doing an appeal, and that took another two years. Petitioner's family has also suffered through this ordeal not only by numerous lost business opportunities and banks severing ties with them, but simply through the personal pain of watching their loved one suffer while incarcerated and through relentless litigation by the government. *United States v. Ferreira*, 665 F.2d 701 (6th Cir. 2011), *Dixon v. White*, 210 Fed. Appx. 498 (6th Cir. 2007)*, United States v. Erenas-Luna*, 560 F.3d 772 (8th Cir. 2009)*, United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006), and the policy behind Speedy Trial rights support a conclusion that

both the negligence that the government committed and the significant length of the delay warrant dismissal of the indictment with prejudice. Finally, in the period of investigation and indictment from January 2001 to sentencing in 2014, Carpenter was always in Connecticut and unlike the defendant in *Handa* who was traveling in India and England, Petitioner was always checking in throughout the entire time. For that reason alone, this Court should vacate Petitioner's conviction pursuant to 18 U.S.C. § 2106.

## CONCLUSION

For the reasons above, Petitioner respectfully requests that this Court should immediately vacate his conviction pursuant to 28 U.S.C § 2106, or grant a judgment of Acquittal; or, in the alternative, to set aside his conviction or dismiss his indictment pursuant to the Speedy Trial Clause violations in this case or pursuant to old Rule 12(b)(3)(B) for lack of jurisdiction because Petitioner's Indictments were both in 2004 well before the law changed in December 2014, and any other relief this Court deems proper.

Respectfully submitted,
/s/ Daniel E. Carpenter
Daniel E. Carpenter Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 18,711 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Times New Roman font.

Dated: June 14, 2024

<u>/s/ Daniel E. Carpenter</u>
Daniel E. Carpenter Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system, which electronically served a copy on all counsel of record.

Dated: June 14, 2024

/s/ Daniel E. Carpenter
Daniel E. Carpenter Petitioner, *pro se*
18 Pond Side Lane
West Simsbury, CT 06092